```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION

 3

 4              CASE NO.:  1123415-CIV-UNGARO/TORRES

 5

   CONSUELO ALFONSO, as Personal
 6 Representative of the Estate of ANTHONY
   ARIAS, and individually as the Natural Parent
 7 and Survivor of ANTHONY ARIAS,

 8      Plaintiffs,

 9 vs.

10 CITY OF HIALEAH, FLORIDA, a
   governmental entity, et al.,
11
        Defendants.
12 _____/

13
                            501 Palm Avenue
14                          Fourth Floor
                            Hialeah, Florida
15                          Tuesday, 10:40 a.m.
                            June 19, 2012
16

17                   DEPOSITION

18                       OF

19            SERGEANT JOSE PROVEYER

20

21         Taken on behalf of the Defendants
        Pursuant to a Notice of Taking Deposition
22

23                     ___

24

25
```

**Bailey & Sanchez Court Reporting, Inc.**
*28 W. Flagler Street, Suite 555, Miami, Florida 33130*
**(305) 358-2829**

```
 1   APPEARANCES:

 2   THE MARTINEZ LAW CENTER, by
     EDWARD A. MARTINEZ, ESQ.,
 3   On behalf of the Plaintiffs.

 4   WILLIAM M. GRODNICK, CITY ATTORNEY, by
     ALAN E. KRUEGER, ASSISTANT CITY ATTORNEY,
 5   On behalf of the Defendant, City of Hialeah.

 6   GAEBE, MULLEN, ANTONELLI & DIMATTEO, P.A., by
     MARK R. ANTONELLI, ESQ., and
 7   DEVANG DESAI, ESQ.
     On behalf of Defendant, Officer Barrios.
 8

 9

10                     WITNESS

11   SERGEANT JOSE PROVEYER

12       Direct Examination (By Mr. Krueger)       3
         Cross Examination (By Mr. Martinez)       72
13       Cross Examination (By Mr. Antonelli)      134

14

15                E X H I B I T S

16       Exhibits 17-39                            3
         Exhibits 40A-40C                          70
17         (Exhibits retained by Mr. Krueger)

18

19

20

21

22

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*
*28 W. Flagler Street, Suite 555, Miami, Florida 33130*
**(305) 358-2829**

```
 1   THEREUPON:
 2              (The following proceedings were held.)
 3              (Thereupon, Exhibits 17 to 39 were marked for
 4   Identification.)
 5   THEREUPON:
 6                    SERGEANT JOSE PROVEYER
 7   was called as a witness by the Defendant, City of
 8   Hialeah, and having first been duly sworn, was examined
 9   and testified as follows:
10              THE WITNESS:  I do.
11                    DIRECT EXAMINATION
12   BY MR. KRUEGER:
13      Q.  Okay.  Just for the record, I've pre-marked
14   Exhibits 17 through 39.
15              Sergeant, will you state your name and your
16   rank and professional capacity?
17      A.  Jose Proveyer, Sergeant, Hialeah Police
18   Department.
19      Q.  How long have you been with the Hialeah Police
20   Department?
21      A.  Nine and a half years.
22      Q.  Was there a period of time when you were with
23   the Homicide Unit of the Hialeah Police Department?
24      A.  Yes.
25      Q.  And when was that?
```

```
 1        A.   November 2007 to March 2010.

 2        Q.   You're presently a sergeant, and I assume

 3   you're on road patrol?

 4        A.   Yes.

 5        Q.   So you're no longer with the Homicide Unit,

 6   you're a sergeant at the present time, correct?

 7        A.   Yes, sir.

 8        Q.   And were you a sergeant at the time you were

 9   with the Homicide Unit?

10        A.   No.

11        Q.   Okay.  You were a detective?

12        A.   Yes.

13        Q.   Okay.  Did you have occasion to investigate a

14   homicide involving a shooting by Officer Barrios and a

15   victim named Anthony Arias?

16        A.   Yes.

17        Q.   Do you recall when that occurred?  Was that on

18   August 19th of 2009?

19        A.   Yes.

20        Q.   Do you know what the location of the shooting

21   was?

22        A.   494 Palm Avenue.

23        Q.   That's right here, on the corner of City Hall,

24   correct?

25        A.   Yes, sir.
```

```
 1        Q.   What is the procedure or what was the procedure
 2   at that time for police officer involved shootings?
 3        A.   Well, it starts with a notification protocol,
 4   which goes all the way from the Chief, all the way down,
 5   but I'm notified by the Homicide Unit sergeant, who's my
 6   direct supervisor, to respond to the scene.
 7        Q.   Okay.  Are persons, other than the Homicide
 8   Unit, involved in the notification process?
 9        A.   In a police shooting, Internal Affairs is also
10   notified.
11        Q.   Okay.  And do they notify any outside agencies,
12   such as of the Medical Examiner's Office and/or the
13   State Attorney's Office?
14        A.   Yes, the lead is responsible for doing that.
15        Q.   Were you the lead investigator in this shooting
16   investigation?
17        A.   Yes.
18        Q.   And did you notify the Medical Examiner's
19   Office and the State Attorney's Office?
20        A.   I notified the State Attorney's Office.  I
21   believe Detective Elosegui notified the ME's Office.
22        Q.   Elosegui was a detective with the Homicide Unit
23   at that time?
24        A.   Yes.
25        Q.   Was there another -- strike that.
```

```
 1              Were there any other members of the Homicide
 2   Unit that were involved in this investigation, other
 3   than yourself and Elosegui?
 4        A.   Yes.
 5        Q.   And who was that?
 6        A.   Detective Jacqueline Perez, Detective Pamela
 7   Zorsky.
 8        Q.   And what was Detective Zorsky's role?
 9        A.   She did the crime scene.
10        Q.   When you say, "She did the crime scene," she
11   was responsible for --
12        A.   Documenting --
13        Q.   -- documenting the evidence at the crime scene?
14        A.   Yes.
15             MR. KRUEGER:  Off the record a second.
16             (Discussion off the record.)
17             MR. KRUEGER:  Back on the record.
18   BY MR. KRUEGER:
19        Q.   Let me show you Exhibit 18.  Is this the crime
20   scene report that Detective Zorsky prepared?
21        A.   Yes, it is.
22        Q.   And did you use that in preparing your report?
23        A.   Yes, I did.
24        Q.   Let me show you what's been previously marked
25   as Exhibit 2.  Do you recognize that document?
```

```
 1        A.    Yes.

 2        Q.    Is that a copy of your report?

 3        A.    It's a copy of my overall -- the overall

 4   report.

 5        Q.    If you turn to the last page in that report --

 6        A.    Yes.

 7        Q.    -- it indicates that there's a finding in that

 8   case?

 9        A.    Yes.

10        Q.    And what is that finding?

11        A.    That the shooting was justified by the State

12   Attorney's Office.

13        Q.    Okay.  Now, I noticed the signature line does

14   not contain your signature.  Is there a reason for that?

15        A.    I left it blank, awaiting the actual close-out

16   memo from the State Attorney's Office, before I signed

17   it and turned it in.

18        Q.    Okay.  So that document is a document that --

19   was that submitted to the State Attorney's Office as

20   your report?

21        A.    Eventually it was.  Not by me, but it was.

22        Q.    Okay.  And it was unsigned, because the State

23   Attorney's Office may or may not conclude what it is

24   that your conclusion was?

25        A.    Correct.
```

1    Q.   Turn to page -- I guess it's Page 2 of your

2  report.  They're not numbered, but it says, "Overview of

3  Facts."

4    A.   Yes.

5    Q.   Would you publish the first paragraph?

6    A.   "On Wednesday, August 19, 2009 at 4:27 a.m.,

7  Hialeah Police received a 911 call from Francisco

8  Barrios (No relation to Officer Alexis Barrios)

9  reference a burglary in progress at 494 Palm Avenue,

10  Hialeah, Florida.  Mr. Barrios and his co-worker,

11  Turreya Burrows, were employed by a waste service

12  company.  Mr. Barrios and Mr. Burrows were in transit in

13  a waste collection truck at the intersection of Palm

14  Avenue and 5th Street facing eastbound.  Mr. Barrios was

15  driving the truck.  Mr. Burrows was the passenger in the

16  truck.  Mr. Burrows observed a male breaking into the

17  cellular telephone store at 494 Palm Avenue.

18  Mr. Burrows also observed a green Chevrolet Tahoe with

19  the headlights on in the parking lot of the business,

20  facing northbound.  The aforementioned vehicle was

21  parked with its driver's side door adjacent to the front

22  door of the business.  Mr. Burrows relayed this

23  information to Mr. Barrios, who, in turn, called 911."

24    Q.   Okay.  The information, as contained in the

25  report, did you make that up, fabricate it, invent it?

1        A.   No.

2        Q.   Was it based on something?

3        A.   The first sentence is based on the actual 911

4    call.  The waste service employees' summary is based on

5    Detective Jacqueline Perez's interview of both those

6    witnesses.

7        Q.   Okay.  Let me refer you to Page 3 of the

8    report.  There is, starting on that page, a

9    transcription of a 911 call.  Is that the 911 call

10   that's referred to in the first paragraph that you

11   published?

12       A.   Yes.

13       Q.   And the time that this call was placed, what

14   time was that?

15       A.   4:27 a.m.

16       Q.   There's a traffic light at the intersection of

17   Palm Avenue and 5th Street; is that correct?

18       A.   Yes.

19       Q.   And the garbage truck that these two

20   individuals were in was stopped at that intersection, at

21   the traffic light, waiting to make a turn northbound on

22   Palm Avenue; is that correct?

23       A.   Yes.

24       Q.   Now, if you go to Page 17 of your report,

25   there's a chart of video times?

1      A.   Yes.

2      Q.   Would you publish the paragraph under "501 Palm

3  Avenue, City Hall"?

4      A.   "Canvass of video surveillance from the area

5  revealed only one source of usable video from 501 Palm

6  Avenue, Hialeah City Hall.  The camera was located on

7  the west wall of the building and faced west towards

8  Palm Avenue.  The camera captured the following sequence

9  of events."

10      Q.   Okay.  Now, with respect to the sequence of

11  events that are reported there, did you view the video?

12      A.   Yes.

13      Q.   And did you record the information that the

14  video revealed in this little chart?

15      A.   Yes.

16      Q.   Okay.  If you look at the first line, it has

17  time and a description.  What is that?  Publish that.

18      A.   "4:24:46, garbage truck northbound on Palm

19  Avenue."

20      Q.   Okay.  Now, do you know whether or not the

21  times on the video camera are synchronized to the times

22  in the police communications?

23      A.   No.

24      Q.   If you -- by "no," do you mean you don't know

25  or they're not?

1     A.   They weren't, but I didn't record it.

2     Q.   Okay.  And if you look at the time that's

3 recorded for the garbage truck northbound on Palm

4 Avenue, and you compare that to the time that the 911

5 call was made, you see that the time the garbage truck

6 was at 5th and Palm Avenue was 4:27 a.m., and the time

7 that the camera records it passing northbound past City

8 Hall is 4:24:46, correct?

9     A.   Yes.

10    Q.   And so it's obvious that there's approximately

11 a three-minute differential between the synchronized --

12 between the police communications' time and the video

13 camera at that location, correct?

14    A.   Correct.

15    Q.   Now, in response to the -- strike that.  Go

16 back to Page 2 of your overview of the facts.  Would you

17 publish the second paragraph, please?

18    A.   "On Wednesday, August 19, 2009 at 4:28 a.m.,

19 Officer Alexis Barrios was dispatched as the primary

20 officer on a '26 in progress' or a burglary in progress.

21 Officer Marcelino Acosta was dispatched as the backup

22 unit.  The police dispatcher advised of a green Tahoe or

23 Suburban outside the "QTH" or location.  The dispatcher

24 also advised that it was possible that someone was still

25 inside the cellular store.  Officer Barrios and Officer

```
 1    Acosta acknowledged the call."
 2         Q.   Okay.  Now, the information that's contained in
 3    that paragraph, was that made up by you?
 4         A.   No.
 5         Q.   It wasn't fabricated by somebody else in the
 6    Department?
 7         A.   No.
 8         Q.   Where did that information come from?
 9         A.   From the dispatch tapes.
10         Q.   Okay.  If you turn to Page 5 of your report --
11         A.   Yes.
12         Q.   -- there's an indication that there's a
13    dispatch tape that's been transcribed, on that page; is
14    that correct?
15         A.   Yes.
16         Q.   And did you listen to that dispatch tape that
17    is transcribed on that page?
18         A.   Yes.
19         Q.   Let me make reference to a map, Exhibit 39.  If
20    you compare the dispatch with that map, can you pinpoint
21    the location where the garbage truck was calling from?
22         A.   Yes, it's marked on the exhibit with a red
23    letter A.
24         Q.   Okay.  And that's at 4:27 a.m., is when -- is
25    where that is.  And does that also indicate the
```

1    approximate location of the store which was allegedly

2    being burglarized?

3         A.   Yes.  It's marked by a red letter B.

4         Q.   Now, if you go back to the dispatch tape, on

5    Page 5 of your report --

6         A.   Yes.

7         Q.   -- would you publish what was on that dispatch

8    tape?

9         A.   "Starting date:  Wednesday, August 19, 2009, at

10   4:28 a.m.

11              "Emergency buzzer goes off.

12              "2310 attention 2314, 26 in progress, 494 Palm

13   Avenue.  494 Palm Avenue.  Shirts 'R' Us.  Advising of a

14   green Tahoe or a Suburban outside of the QTH.  Seems

15   like someone's inside.  Still receiving 428."

16        Q.   Okay.  Now, let me stop you right there.  I

17   noticed that it says, "Shirts 'R' Us."  Do you know why

18   the dispatcher says, "Shirts 'R' Us," when the report

19   from the truck driver of the garbage truck said that it

20   was a mobile phone store?

21        A.   When the call is received into dispatch, it

22   automatically puts in the last -- the name of the store

23   that it had on its record.

24        Q.   Okay.  So the last store in the police records,

25   from whatever the source is that they derive the

1  location information from, indicated that that

2  particular address was a Shirts 'R' Us, correct?

3      A.   Correct.

4      Q.   And the dispatcher is not the person that

5  talked to the 911 caller, there's a 911 call taker that

6  took that information, correct?

7      A.   Correct.

8      Q.   Does that same information, Shirts 'R' Us,

9  appear on a computer in the police officer's unit?  Let

10 me make reference to an exhibit, Exhibit 35.  Was that a

11 photograph that was taken of the police officer's

12 unit -- Officer Barrios' unit, the computer inside that

13 unit?

14     A.   Yes.

15     Q.   And does that indicate on it that Shirts 'R' Us

16 is the location --

17     A.   Yes.

18     Q.   -- or the business at that location?

19     A.   Yes, it does.

20     Q.   And does it have the correct address, 434 --

21     A.   494 Palm Avenue, yes.

22     Q.   -- 494?

23          Now, that's an obvious error that appeared in

24 the record of the information that was transmitted by

25 the Police Department.  Is that unusual?

1      A.   No, it's not unusual.

2      Q.   Is that material to a determination of anything

3   that happened in this case?

4      A.   No.

5      Q.   Okay.  Continue with the publication of the

6   information from the transcript of the police

7   communications with the dispatcher and the original

8   unit.

9      A.   "East 4 and 17."

10     Q.   Okay.  What does East 4 and 17 indicate?

11     A.   That's an officer advising his

12   starting responding location, East 4th Avenue and 17th

13   Street.

14     Q.   And in listening to that tape, were you able to

15   identify the speaker of that particular communication?

16     A.   Yes, Officer Barrios.

17     Q.   Okay.  If you refer to Exhibit 39, which is the

18   map, is there an indication on that particular map of

19   where that location is?

20     A.   Yes, it's marked in the exhibit as a red letter

21   C.

22     Q.   Okay.  Continue with the publication of what

23   the dispatch tape said.

24     A.   "Both."

25     Q.   And who is saying that?

```
 1        A.   Officer Marcelino Acosta.

 2        Q.   Okay.  And continue with the --

 3        A.   "2310 and 2314.  They're advising it seems that

 4   someone's inside the mobile store."

 5        Q.   That's the dispatcher speaking?

 6        A.   Yes.

 7             If you want me to continue, I'll do that.

 8        Q.   Yes.

 9        A.   I'll advise who's speaking, before I do the

10   quote.

11        Q.   Okay, thank you.

12        A.   Officer:  "QSL."

13             Officer:  "Confirming a green Tahoe."

14             Dispatcher:  "A green Tahoe or a Suburban."

15             Officer:  "QSL."

16             Dispatch:  2310 and 14, the complainant is the

17   garbage man.  Advising he hung up on the desk."

18             Officer:  "QSL."

19        Q.   Incidentally, what does "QSL" stand to?

20        A.   Okay or affirmative.

21        Q.   That means he's received the signal and

22   understands the communication, correct?

23        A.   Yes.

24             Next officer:  "14, what's the numerical?"

25             Dispatch:  "494 Palm Avenue."
```

```
 1              Officer:  "QSL".
 2       Q.   14, what does that indicate?
 3       A.   That's Officer Acosta, advising his unit
 4  number, 2314.  He just shortened his number.
 5       Q.   So his unit number is actually 2314, but
 6  typically officers will either say only the last numbers
 7  or the first two numbers will be cut off when he keys in
 8  the mike?
 9       A.   Yes.
10       Q.   And so he's asking, in essence, what is the
11  address of the location where this burglary is ongoing,
12  right?
13       A.   He's asking dispatch to verify the address.
14            Continue?
15       Q.   Yeah, the next information that is on the
16  dispatch tape?
17       A.   "Starting date:  Wednesday, August 19, 2009,
18  4:30 a.m."
19       Q.   So it's still at the same time, approximately,
20  as the original transmission?  So it hasn't changed?
21  Less than a minute has elapsed, correct?
22       A.   Yes.  The only reason I put that in there is
23  because the way I received a copy of the channel -- the
24  dispatch tape from Dispatch, it cuts it off sometimes.
25       Q.   Yeah.
```

```
1        A.   And it gives me a new starting time.

2        Q.   And the starting time is something that is

3   actually on the tape that you get from the

4   Communications Division; is that correct?

5        A.   Yes.

6        Q.   So it will say, "Starting time:  Wednesday,

7   August 19, 2009, 4:30 a.m." in sort of a computerized

8   human voice?

9        A.   Yes.

10            Officer:  "2310."

11            Dispatch:  "2310."

12            Dispatch:  "2310."

13            Dispatch:  "2310 QSK."

14       Q.   Okay.  Let me just go back over that.  2310 is

15  indicating what?

16       A.   That's Officer Barrios' call number.

17       Q.   Okay.  And by saying "2310," what is he doing?

18       A.   He's raising dispatch to be acknowledged.

19       Q.   Okay.  Does that indicate that he's arrived at

20  the location?

21       A.   It would be the next logical transmission that

22  he would give.

23       Q.   Okay.  Now, you see that the dispatcher is

24  asking 2310 three times.  What does that indicate?

25       A.   He's not answering his radio.
```

```
1       Q.   And what does the QSK indicate?

2       A.   Go ahead, proceed with your transmission.

3       Q.   Continue with the next transmission.

4       A.   Officer:  "Shots fired.  Shots fired."

5       Q.   Okay.  Now, do you know who said that?

6       A.   Officer Barrios.

7       Q.   And how do you know that?  Did you listen to

8  the tape and identify the voice?

9       A.   I recognize the voice.

10       Q.   Did you measure the time between the

11  announcement of 2310 by Officer Barrios and the

12  announcement of shots fired by Officer Barrios and how

13  much time had elapsed between?

14       A.   Yes, I did.  I estimated it at sixteen seconds.

15       Q.   Now, just for the record, I'm playing back part

16  of the dispatch tape that starts with raising the

17  officers, from the alert signal that you described as a

18  buzzer.

19            (Thereupon, a portion of the dispatch recording

20  was played.)

21  BY MR. KRUEGER:

22       Q.   Now, let me let you look at this particular

23  playback.  This is on Windows Media Player.  Are you

24  familiar with the Windows Media Player?

25       A.   Yes.
```

```
 1              (Thereupon, a portion of the dispatch recording
 2    was played.)
 3              THE WITNESS:  That's way ahead.
 4              (Thereupon, a portion of the dispatch recording
 5    was played.)
 6    BY MR. KRUEGER:
 7       Q.   What I want you to do at this point is to look
 8    at the elapsed time on the counter and compare the
 9    starting time of the announcement by the officer of his
10    arrival by announcing his number, with the time when the
11    announcement of his number ends.
12              (Thereupon, a portion of the dispatch recording
13    was played.)
14    BY MR. KRUEGER:
15       Q.   All right.  He starts to say "23," and it's at
16    1:32; is that correct?
17       A.   Yes.
18       Q.   And when he finishes saying "10," it's 1:34,
19    correct?
20       A.   Correct.
21       Q.   Okay.  So he doesn't say "2310" in a complete
22    normal way, he says "23" and then there's a pause and
23    then theres a "10," correct?
24       A.   Yes.
25       Q.   So it takes two seconds for him to make that
```

```
 1  announcement, correct?
 2       A.   Correct.
 3       Q.   Okay.  Now, let me refer you back to the rest
 4  of the tape.  Continue from where you left off.
 5            Had you said, "Shots fired"?
 6       A.   I said, "Shots fired.  Shots fired."
 7       Q.   All right.  You've indicated, "Shots fired."
 8            Okay.  Let's go back to this sequence and
 9  measure the time, the elapsed time.  If we start at the
10  point where he starts to say "2310," and the time that
11  he says, "Shots fired," tell me how many seconds you
12  count on the counter that have elapsed.
13            (Thereupon, a portion of the dispatch recording
14  was played.)
15  BY MR. KRUEGER:
16       Q.   Okay.  It's 1:48, on the counter, when he says,
17  "Shots fired," correct?
18       A.   Yes.
19       Q.   And if you take the starting time of when he
20  first announces "2310," which was 1:32 --
21       A.   1:32.
22       Q.   -- you come up with 16 seconds, correct?
23       A.   Yes.
24       Q.   And if you take the ending time of when he
25  said, "2310," you come up with 14 seconds until he says,
```

```
 1    "Shots fired," correct?

 2         A.   Correct.

 3         Q.   Okay.  Let me refer you now to the video

 4    section on the report, on Page 17.

 5         A.   Yes.

 6         Q.   Subsequent to the garbage truck arriving,

 7    there's an indication that two police cars pass by that

 8    location in front of City Hall, correct?

 9         A.   Correct.

10         Q.   And the time on the first marked unit to pass

11    by is, what?

12         A.   4:32:09.

13         Q.   Okay.  And the time that the second unit passes

14    by that location is, what?

15         A.   4:32:22.

16         Q.   So if you subtract the nine seconds from the

17    twenty-two seconds, you've got what, thirteen seconds?

18         A.   Yes, sir.

19         Q.   So there's a thirteen-second differential

20    between the first car that passes by and the second car

21    that passes by, correct?

22         A.   Correct.

23         Q.   Now, if you go to the map on Page -- on Exhibit

24    39, is there an indication on that map of where the

25    camera location is approximately located?
```

1    A.   It's on the exhibit as a red letter E.

2    Q.   Let's go back to the dispatch tape, on Page 6.

3         After "Shots fired," what happens on that tape?

4    A.   "Emergency buzzer goes off."

5         Dispatch:   "2318 and 2315, 3-15, 494 Palm

6    Avenue, advising shots fired.   All units stay off the

7    air."

8    Q.   What does that indicate?

9    A.   That's the dispatcher sending two more units,

10   advising them to respond 3-15, which means emergency

11   backup.   She gives the address, 494 Palm Avenue.   She

12   advises that shots were fired, and she's advising all

13   other units to stay off the radio.   That way, if

14   something is going on on the scene that an officer needs

15   to talk, the air is clear and the air is open.

16   Q.   Okay.   What happens if there is somebody on the

17   air while an officer who's involved in a shooting is

18   trying to communicate to dispatch?   Does that interfere

19   with his ability to communicate?

20   A.   Yes.   They may never be heard.

21   Q.   Are there times when officers -- two officers

22   attempt to talk to dispatch at the same time?

23   A.   Yes.

24   Q.   And what happens in those circumstances?

25   A.   Sometimes, if the key up at the same time,

```
 1   they'll both sound muffled, you won't be able to
 2   understand anything.  Sometimes, if one keys up before
 3   the other, the one that keyed up first will override the
 4   other one, and the other one will never be heard.
 5       Q.   Okay.  Now, has that ever happened to you,
 6   where you keyed up in a situation and made an
 7   announcement to dispatch, but somebody else has gotten
 8   through to dispatch before you?
 9       A.   Sunday night.
10       Q.   And when that occurs, are you always aware that
11   whatever it is you're communicating has not been
12   received by dispatch?
13       A.   Sometimes you think you were acknowledged;
14   sometimes it's obvious that you weren't.
15       Q.   So the fact that somebody says into the mike,
16   "Send rescue, send fire rescue, send assistance, shots
17   fired," that may or may not get communicated, and yet
18   the person may think he's communicated it; is that
19   correct?
20       A.   Yes.
21       Q.   All right.  Continue with what the dispatch
22   tape indicated.
23       A.   Officer:  "2300 start him more units."
24       Q.   All right.  2300 is who, the lieutenant?
25       A.   That is the shift commander, Lieutenant
```

Jerimiah McIntyre.

    Q.   Okay.  So he comes on and he announces his unit
and what is he doing, saying to send more backup to
assist the officers?

    A.   Saying -- he's trying to say, send them more
than just two guys.  Dispatch had just sent two people.

    Q.   Okay.  And what happens after that?

    A.   The emergency buzzer goes off.

        "Dispatch:  Advising city wide 3-15, city wide
3-15, 494 Palm Avenue, 430."

    Q.   Okay.  What does the "430" indicate?

    A.   The time.

    Q.   So it's still 4:30?

    A.   Yes.

    Q.   So the time -- not more than a minute has gone
by since the officer arrived at the scene and not more
than a minute has gone by since -- strike that, not more
than two minutes have gone by since the original call
came in at 4:28, correct?

    A.   Yes.

    Q.   Now, immediately after -- strike that.  When
the dispatcher says, "Advising city wide 3-15," is that
the exact instruction that the lieutenant gave to the
dispatcher?

    A.   No.

1      Q.   What's different about it?

2      A.   He just said, "Start him more units."  Usually,

3   in that case, she would have sent maybe the two

4   adjoining -- one adjoining sector unit or two adjoining

5   sectors.  The dispatcher went all out.

6      Q.   And what, she sent everybody?

7      A.   Everybody in the city to respond, whether

8   you're on an extra duty, whether you're on -- whatever

9   you're on, every Hialeah Police officer has to respond

10   to a city wide 3-15.

11      Q.   It's an obvious error, correct?

12      A.   Yes.

13      Q.   Is it material to anything that happened in

14   this case in investigating the shooting incident?

15      A.   No.

16      Q.   Better safe than sorry?

17      A.   Yes.  Your more experienced dispatchers, with

18   many, many years on, will know, by an officer's

19   inflexion of his voice, the nature of the call, they'll

20   know when to start a city wide 3-15 whether it's

21   authorized or not.

22      Q.   Okay.  What is the next indication on the

23   communication?

24      A.   Officer:  "Unintelligible, start rescue."

25      Q.   Okay.  Let me go to the dispatch tape.

```
 1              (Thereupon, a portion of the dispatch recording
 2    was played.)
 3    BY MR. KRUEGER:
 4         Q.   Now, since the time of this incident, have you
 5    had occasion to either supervise or listen to radio
 6    communications by Officer Gonzalez, Raul Gonzalez?
 7         A.   Yes, he was my subordinate for over a year.
 8         Q.   And listening to that part of the tape where I
 9    have played the part that you indicated was,
10    "unintelligible, start rescue," are you able to clarify
11    that particular communication?
12         A.   Yes.  That is Officer Raul Gonzalez saying,
13    "19, start rescue."
14         Q.   And 19 indicates what?
15         A.   That's his call number that evening, 2319.  He
16    shortened it up.
17         Q.   Okay.  Now, this particular -- let me have you
18    look at the counter on this, so you could see when that
19    particular communication is made.
20              (Thereupon, a portion of the dispatch recording
21    was played.)
22    BY MR. KRUEGER:
23         Q.   That's 2:23, correct?
24         A.   Correct.
25         Q.   And the time that the 2310 was finished being
```

```
 1   announced, when Officer Barrios announced his arrival,
 2   was 1:34, correct?
 3       A.   Correct.
 4       Q.   That's what, 49 seconds?
 5       A.   Yes, sir.
 6       Q.   So between the arrival of Officer Barrios and
 7   the announcement by Officer Gonzalez that rescue should
 8   be started, 49 seconds have elapsed, correct?
 9       A.   Yes.
10            (Thereupon, a portion of the dispatch recording
11   was played.)
12   BY MR. KRUEGER:
13       Q.   Okay.  Following the communications of to start
14   rescue, what happens next?
15       A.   Dispatch:  "QSL."
16       Q.   What does that indicate?
17       A.   She acknowledges the start rescue request.
18       Q.   Okay.  And, then, what happens?
19       A.   Officer:  "14, slow 'em down."
20       Q.   Now, Officer 14 -- who's Officer 14?
21       A.   That's Marcelino Acosta, Call Number 2314.
22       Q.   By "slow 'em down," what is he indicating?
23       A.   He's saying, slow down -- the rest of the units
24   coming to that area, to slow them down, to stop them
25   running emergency lights and sirens.
```

```
 1        Q.   Because the emergency is over, correct?

 2        A.   Yes.

 3        Q.   All right.  Let's go back to the dispatch tape

 4   and compute the time between the end of "start rescue"

 5   and the "14, slow 'em down."

 6             (Thereupon, a portion of the dispatch recording

 7   was played.)

 8   BY MR. KRUEGER:

 9        Q.   Okay.  "Start rescue" is concluded, also,

10   within that same 2:23 period, correct?

11        A.   Yes.

12        Q.   14 comes on at 2:33, correct?

13        A.   Yes.

14        Q.   So that's ten seconds that elapsed between the

15   communication of "start rescue" and the communication by

16   Officer Acosta to "slow 'em down," correct?

17        A.   Yes.

18        Q.   So both of those units, 14 and 19, are on the

19   scene at approximately the same time, at least within

20   ten seconds of each other, correct?

21        A.   Yes.

22        Q.   Let's go back to Page 2, the Overview of Facts.

23   Would you publish -- I don't think you published before

24   Paragraph 3.

25        A.   No.
```

```
 1              "On Wednesday, August 19, 2009 at 4:30 a.m.,

 2   Officer Barrios arrived and parked his marked Hialeah

 3   Police cruiser at the entrance of the parking lot of 494

 4   Palm Avenue.  Shortly thereafter, Officer Barrios

 5   advised 'Shots fired, shots fired,' via police radio.

 6   Backup units arrived and found a white male lying on the

 7   ground.  The male had sustained two gunshot wounds.  A

 8   green in color Chevrolet Tahoe was in the parking lot.

 9   The vehicle was running and its gear shift was in the

10   drive position.  The vehicle was resting against a curb.

11   Hialeah Fire Department personnel responded and

12   transported the male to Jackson Memorial Hospital Ryder

13   Trauma Center, where he was pronounced dead.  The male

14   was later identified as Anthony Robert Arias,

15   hereinafter referred to as the decedent."

16        Q.   Okay.  Some of the information that appears in

17   that third paragraph was covered with what we were just

18   going over, in terms of the communications tape,

19   correct?

20        A.   Correct.

21        Q.   And was anything in that paragraph that you

22   just published fabricated?

23        A.   No.

24        Q.   Was it based on false information or

25   intentionally manipulated information?
```

1   A. No.

2   Q. Now, if you turn to Page 12 of your report, the

3 section that deals with Officer Marcelino Acosta --

4   A. Yes.

5   Q. -- would you publish that, please?

6   A. "Officer Acosta was dispatched as a backup

7 officer to Officer Barrios and was the first officer to

8 arrive after the shooting.  Officer Acosta arrived on

9 the scene and saw a green Chevrolet Tahoe just south of

10 Officer Barrios' vehicle.  He saw the decedent lying on

11 the ground next to the Tahoe.  Officer Acosta requested

12 fire rescue via police radio and started securing the

13 scene.  He did not see what occurred nor heard

14 gunshots."

15   Q. Okay.  If we look at Composite Exhibit 14, do

16 you know whose vehicles are shown in that photograph,

17 that aerial photograph?

18   A. Yes.  This is depicting the southwest corner of

19 Palm Avenue and 5th Street.  The vehicle marked by the

20 Rooftop Number 2710, that Officer Alexis Barrios' police

21 unit.

22   Q. That's in the entrance/exit of that particular

23 shopping center, correct?

24   A. Correct.

25   Q. And is there another police unit?

```
 1        A.   The other unit, marked by its Rooftop Number

 2   2315, facing northbound, in the southbound lanes, is

 3   Officer Marcelino Acosta's.

 4        Q.   Okay.  Now, based on that photograph, it

 5   appears that Officer Barrios was heading southbound on

 6   Palm Avenue and entered the entrance to that shopping

 7   center, correct?

 8        A.   Yes.

 9        Q.   And that Officer Acosta was heading northbound

10   on Palm Avenue and stopped at about the center of the

11   street; is that correct?

12        A.   Yes.

13        Q.   So they were coming from opposite directions,

14   it would appear, from that photograph, correct?

15        A.   Correct.

16        Q.   Now, at the time that you listened to the tape

17   of the dispatcher and the officer that was advising as

18   to fire rescue and as to slowing them down, you thought

19   that both -- that the officer that was speaking with

20   reference to both of those announcements was Officer

21   Acosta; is that correct?

22        A.   Yes.

23        Q.   And since that time, you've learned that the

24   first officer that announced fire rescue should be sent

25   was not the same officer as the officer that said, "Slow
```

```
 1   'em down," correct?
 2        A.   Correct.
 3        Q.   That photograph in Exhibit 14 does not indicate
 4   that Officer Gonzalez's vehicle is on that scene at that
 5   time when that photograph was taken; is that correct?
 6        A.   Correct.
 7        Q.   And yet we know, from the dispatch, that he was
 8   on that scene, correct?
 9        A.   Yes.
10        Q.   And we know from the videos that his -- that a
11   second vehicle approached the same spot in front of City
12   Hall, which is diagonally in the middle of the next
13   block from the scene, thirteen seconds after Officer
14   Barrios' vehicle passed that point; is that correct?
15        A.   Yes, a second vehicle is seen.
16        Q.   And we would assume, logically, that the second
17   vehicle was Officer Gonzalez, because it was within
18   thirteen seconds, and he's already on the air announcing
19   "send fire rescue" within a few seconds of the shots
20   fired?
21        A.   We could assume.
22        Q.   Does that make any material difference in the
23   outcome of your investigation, that you were not aware
24   that the first unit that requested fire rescue was
25   Officer Gonzalez, as opposed to Officer Acosta?
```

```
 1        A.   No.

 2        Q.   Turn to Page 22 of your report, which is the

 3   Disposition section.

 4        A.   Yes.

 5        Q.   And would you read the first paragraph,

 6   starting with "Decedent"?

 7        A.   "Decedent was in the commission of a forcible

 8   felony.  (Burglary to the business.)  Laboratory results

 9   confirm that the decedent's blood was inside the store.

10   The blood was located on the shattered glass of a

11   display case near the front door.  Numerous cellular

12   telephones, in their unopened packages, were recovered

13   from the decedent's green colored Chevrolet Tahoe."

14        Q.   Let me show you Exhibit 17.  Is that blood that

15   was recovered or depicted in the display case inside the

16   store?

17        A.   Yes.

18        Q.   I'm showing you Exhibit 3, which is the Crime

19   Laboratory Bureau and Miami-Dade Police Department

20   Report, Exhibit Number 10, what does that indicate -- or

21   Item Number 10?

22        A.   Item 10 of Exhibit 3 is the description of

23   swabs inside display case.

24        Q.   And what is the indication of the result?  Was

25   that positive or negative for --
```

1     A.   The result is positive.

2     Q.   Was anything in the paragraph that you read

3 under Disposition fabricated, made up or based on false

4 information?

5     A.   No.

6     Q.   Was it corroborated by that report --

7     A.   Yes.

8     Q.   -- from the Crime Lab at Metro-Dade?

9     A.   Yes.

10     Q.   Referring to Exhibit 18 -- you may have to take

11 that out of the sleeve -- if you look at Page 4 of that

12 exhibit, this is the report that Detective Zorsky

13 prepared; is that correct?

14     A.   Yes.

15     Q.   And it indicates on this that there were

16 certain items that were impounded inside the store,

17 correct?

18     A.   Yes.

19     Q.   And does it indicate that at 9:30 a.m. blood

20 swabs were impounded from outside the glass of the

21 display case closest to the front door and inside the

22 top glass shelf of the glass case closest to the front

23 door?

24     A.   Yes, 9:30 and 9:32 a.m.

25     Q.   And those items were photographed and

1  impounded, correct?

2      A.  Yes.

3      Q.  And those are the items that were presented to

4  the lab, the Metro-Dade lab, for analysis?

5      A.  Yes, sir.

6      Q.  Let's go back to Page 22, the Disposition page

7  of your report, which is Exhibit 2.

8      A.  Yes.

9      Q.  Would you publish that?

10      A.  Paragraph 2?

11      Q.  Yes.

12      A.  "Placement of subject's green Chevrolet Tahoe

13  on scene.  The vehicle was originally seen by the 911

14  witness facing a northerly direction close to the front

15  door of the burglarized business.  The vehicle was found

16  facing a southeasterly direction towards the exit of the

17  parking lot.  The vehicle's right front tire was angled

18  to the right and resting upon the parking lot curb.  The

19  vehicle was still in the drive position when officers

20  arrived after the shooting.  The vehicle was positioned

21  between the aforementioned parking lot curb and Officer

22  Barrios' marked police vehicle.  Conceivably, any person

23  finding themselves in between the parking lot curb

24  containing high bushes and the marked police vehicle

25  would find themselves in a tunnel, with no escape route.

1    A vehicle travelling towards a person in this area would

2    put the individual in a position to be struck by the

3    vehicle, subsequently resulting in death and/or great

4    bodily harm."

5         Q.   Now, the last two sentences in that paragraph,

6    those were your opinions, correct?

7         A.   Yes.

8         Q.   And that was based on your analysis of the

9    information that you saw on the scene and that had been

10   gathered by other detectives and crime scene

11   technicians, correct?

12        A.   Correct.

13        Q.   Was there anything in that paragraph that was

14   made up or based on fabricated or intentionally

15   manipulated evidence?

16        A.   No.

17        Q.   If we go back to those aerial views of the

18   vehicles, Exhibit 14, is that the view that you're

19   describing in that paragraph that we just read?

20        A.   Yes.

21             MR. KRUEGER:  Off the record for a second.

22             (Short recess taken.)

23   BY MR. KRUEGER:

24        Q.   Let me show you what's been marked as Exhibit

25   14, Page 9.  Is that a photograph of the SUV's front

```
 1   right tire?

 2       A.   Yes.

 3       Q.   And was that the position it was in when you

 4   observed it?

 5       A.   Yes.

 6       Q.   And the tire was wedged against the parking lot

 7   curbstone?

 8       A.   Yes.

 9       Q.   Now, if we go to the dispatch tape, on Pages 3

10   and 4 of your report, which is Exhibit 2, there's a

11   reference to the vehicle that was parked outside the

12   mobile phone store, correct, as being a green Tahoe?

13       A.   Yes.

14       Q.   And police took statements from the driver of

15   the vehicle, who was the one that was speaking on this

16   tape, as well as the passenger in that vehicle, who was

17   the one who was making the observations, correct?

18       A.   Yes.

19       Q.   And they had indicated in their statements that

20   the vehicle was facing with its headlights in a north --

21   northerly direction, correct?

22       A.   Yes.

23       Q.   Given that description of the vehicle and its

24   position in the parking lot at the time you observed it,

25   it's obvious that it had been moved from the position it
```

1   was in at the time the witnesses observed the store

2   being robbed; is that correct --

3       A.   Yes.

4       Q.   -- or burglarized?  Strike, robbed.

5            In order to be facing in the position that the

6   vehicle was at the time you observed it, from the

7   position it was described in at the time the garbage man

8   described it, did that vehicle have -- would that

9   vehicle have had to have moved in a reverse gear, in

10  order to back up, and then move forward at an angle to

11  the east end of that shopping center?

12      A.   Yes, it would have to have been put in reverse,

13  traveling reverse southbound through the parking lot,

14  and then made the right turn towards the exit.

15      Q.   Turn to Page 7 of your report, Exhibit 2.

16  Mr. Burrows --

17      A.   Yes.

18      Q.   -- had you published this previously in this

19  deposition?

20      A.   No.

21      Q.   Okay.  Would you publish that paragraph?

22      A.   "Turreya Burrows is employed by Waste Services,

23  Incorporated.  Mr. Burrows operates a garbage truck for

24  the business.  Mr. Barrios (sic) was sitting in the

25  passenger seat of the garbage truck being driven by his

1    partner" -- there's going to be a typo there.

2        Q.   Francisco Barrios is the next word?

3        A.   Yes, but the first name in the sentence is

4    actually Mr. Burrows there.  So I'll read it as

5    Mr. Burrows.

6             "Mr. Burrows was sitting in the passenger seat

7    of the garbage truck being driven by his partner,

8    Francisco Barrios.  They were stopped at the

9    intersection of Palm Avenue and 5th Street waiting to

10   make a left turn and proceed northbound on Palm Avenue.

11   Mr. Burrows looked toward his right (south) and observed

12   a green in color Chevrolet Tahoe or Suburban in the

13   parking lot of 494 Palm Avenue.  Mr. Burrows stated the

14   aforementioned vehicle was facing north and had its

15   headlights on.  The vehicle's driver's door was parallel

16   with the business' front glass door.  Mr. Burrows saw a

17   white male, possibly Hispanic, in the business.  Mr.

18   Burrows relayed what he was observing to Mr. Barrios,

19   who called 911.  Mr. Burrows observed the remainder of

20   the incident from Palm Avenue and 7 Street.  Mr. Burrows

21   observed a marked police unit turn left and proceed

22   southbound from Palm Avenue and 9 Street.  The marked

23   police unit passed Mr. Burrows at Palm Avenue and 7

24   Street.  The marked police unit then parked in front of

25   494 Palm Avenue.  Shortly thereafter, Mr. Burrows heard

```
 1   three gunshots."

 2        Q.   Okay.  Let's look first at the second sentence,

 3   where it says, "Mr. Barrios was sitting in the passenger

 4   seat."  You've indicated that is a typographical error

 5   or an error?

 6        A.   Yes.

 7        Q.   It should have been Mr. Burrows?

 8        A.   Yes.

 9        Q.   Okay.  Does that -- was that an intentional

10   error?

11        A.   No.

12        Q.   Was it an intentional fabrication?

13        A.   No.

14        Q.   Does it change the material facts on which you

15   made your decision with reference to your conclusions in

16   this case?

17        A.   No.

18        Q.   Now, the indication from -- was any of that

19   information fabricated or made up or based on

20   intentionally false information?

21        A.   No.

22        Q.   This was based on statements that both of these

23   two witnesses gave, as well as the recording of the 911

24   call, correct?

25        A.   Correct.
```

```
 1        Q.   Now, Mr. Burrows indicates that he observed

 2   some of the incident from Palm Avenue and 7 Street,

 3   correct?

 4        A.   Yes.

 5        Q.   Turn to the map, which is Exhibit 39.

 6        A.   Yes.

 7        Q.   Okay.  There's an indication on that map as to

 8   where, approximately, he would have been to make the

 9   observations he's describing; is that correct?

10        A.   Yes.

11        Q.   And what letter is that?

12        A.   It's marked by a red letter D.

13        Q.   Okay.  Now, according to Mr. Burrows, the

14   vehicle, that was the police car that passed by him, was

15   seen to proceed down from 9th Street onto Palm Avenue;

16   is that correct?

17        A.   Yes.

18        Q.   If you look at that map, does that map -- does

19   the red line drawn on that map accurately depict the

20   path of a vehicle from the announced position that

21   Officer Barrios relayed on the radio at 4th and 17th

22   through its arrival at the scene of this incident at 494

23   Palm Avenue?

24        A.   Yes.

25        Q.   Now, Mr. Burrows indicated that he heard three
```

```
 1   gunshots; is that correct?

 2        A.   Yes.

 3        Q.   Was there another witness that heard gunshots?

 4        A.   Yes, the doctor's answering service night

 5   attendant.

 6        Q.   Okay.  If you turn to --

 7        A.   She's on the same page as --

 8        Q.   She's at the bottom.  Would you publish the

 9   statement or the information that you obtained from the

10   doctor's answering service night attendant?

11        A.   "Lourdes Trujillo is employed by Answering

12   Unlimited, 488 Palm Avenue, Hialeah, Florida.  The

13   business is located in the same shopping center where

14   the incident took place.  Mrs. Trujillo was working the

15   midnight shift when she heard two gunshots.  Shortly

16   thereafter, she approached the locked front door of the

17   business and observed a large vehicle blocking the

18   entrance to the parking lot.  She also observed several

19   officers in the parking lot and a male on the ground by

20   the driver's side of the vehicle.  She did not observe

21   the actual shooting."

22        Q.   Is there anything that's contained in that

23   statement that was fabricated by you or any member of

24   the Police Department?

25        A.   No.
```

1      Q.   It's based on information that was relayed to

2  you by this witness or relayed to the Hialeah Police

3  Department by this witness?

4      A.   Yes.

5      Q.   Now, Mrs. Trujillo indicates that she heard two

6  gunshots fired, correct?

7      A.   Correct.

8      Q.   And by the time she got to view the scene, they

9  were already -- there was already more than one officer

10  at the scene, correct?

11      A.   Yes.

12      Q.   And does that comport with what the findings

13  were and the timings, based on the analysis we had done

14  of the calls that were received through communications

15  and the officers that had arrived or apparently arrived

16  to give those communications?

17      A.   Yes.

18      Q.   So that is consistent with the information that

19  the officers had arrived after the shooting?

20      A.   Yes.

21      Q.   Except for the shooter?

22      A.   Yes.

23      Q.   Now, the fact that she describes two gunshots

24  and the driver of the -- strike that, the passenger from

25  the garbage truck described three shots, is that a

```
 1  material variation that affects your decision in this
 2  case?
 3       A.   No.  It's not uncommon for witnesses to hear
 4  different amounts of gunshots.
 5       Q.   Was there any evidence as to how many gunshots
 6  were actually fired?  Was there any physical evidence --
 7       A.   Yes.
 8       Q.   -- of how many gunshots were fired?
 9       A.   Yes.
10       Q.   And what evidence was that?
11       A.   Two spent casings found on the scene.
12       Q.   Let me show you what's been marked as a
13  Composite Exhibit, 33-A and 33-B.  Are these the two
14  casings that you're referring to?
15       A.   Yes, they are.
16       Q.   And where were they found?
17       A.   Exhibit 33-A, marked by Marker Number 1, was
18  found on the ground, in between the green Chevy Tahoe
19  and Officer Barrios' marked police unit.  Exhibit 33-B,
20  marked by a Marker Number 2, was found on the glass of
21  the green Chevy Tahoe, just above the driver's side
22  windshield wiper.
23       Q.   Those items are also described in Detective
24  Zorsky's report -- Crime Scene Report, Exhibit
25  Number 18, on Page 2; is that correct?
```

```
 1        A.   Yes.

 2        Q.   Down at the bottom of the page, there's a

 3   description of Marker 1 and Marker 2, correct, and the

 4   locations where they were found, correct?

 5        A.   Correct.

 6        Q.   And the fact that they were photographed and

 7   impounded, correct?

 8        A.   Correct.

 9        Q.   Let me refer you to Exhibit 24.  What does

10   Exhibit 24 indicate?

11        A.   It's a photograph of the windshield -- the

12   front windshield of the green Chevrolet Tahoe.

13        Q.   And do you know what side of the windshield

14   that shows?

15        A.   It's going to be on the right side or the

16   passenger's side.

17        Q.   And how many -- how many entries of bullets are

18   shown in that windshield?

19        A.   Two projectile strike marks on the front

20   windshield.

21        Q.   Let me refer you to Exhibit 27.

22        A.   Yes.

23        Q.   What is Exhibit 27?  Is that the autopsy

24   report?

25        A.   Yes.
```

```
 1        Q.   And turning to Page 4 of that report, does that
 2   indicate, in the autopsy findings, how many gunshot
 3   wounds were found in the decedent?
 4        A.   Yes.  It indicates, two.
 5        Q.   And where were they located?
 6        A.   One penetrating gunshot wound of the chest and
 7   two penetrating gunshot wounds of the right hand.
 8        Q.   And this is for the autopsy of Anthony Robert
 9   Arias; is that correct?
10        A.   Yes.
11        Q.   Let me refer you to Exhibits 28 and 29.  Can
12   you tell me what those exhibits indicate?
13        A.   It's a photograph of Mr. Arias, indicating one
14   gunshot wound to the chest.  That's Exhibit 28.  Exhibit
15   29 is depicting a gunshot wound to the right hand of
16   Mr. Arias.
17        Q.   And was that received by you from the Medical
18   Examiner's Office, those photographs, or from the --
19        A.   These may be the CSI pictures at JMH.
20        Q.   Okay.  So those are the photographs that were
21   taken by the Crime Screen --
22        A.   Rios.
23        Q.   -- Unit of the Hialeah Police Department,
24   correct?
25        A.   Yes.
```

```
 1        Q.   And they confirm what the autopsy -- or they're
 2   consistent with what the autopsy revealed about the
 3   wounds to Anthony Arias; is that correct?
 4        A.   Yes.
 5        Q.   And are they consistent with the bullet strikes
 6   in the windshield of the SUV?
 7        A.   Yes.
 8        Q.   And are they consistent with the recollection
 9   of the witness from the doctor's answering service, who
10   indicates that she heard two shots fired?
11        A.   Yes.
12        Q.   Was the weapon from the officer who fired those
13   shots impounded?
14        A.   Yes, it was.
15        Q.   Was there an indication as to how many shots
16   were fired by that weapon?
17        A.   He was missing two rounds.
18        Q.   And so all those things indicate that there
19   were two shots fired, as opposed to three shots fired,
20   by the officer whose weapon resulted in the wounds to
21   the decedent, Anthony Arias; is that correct?
22        A.   Yes.
23        Q.   Was all that information made available to the
24   State Attorney's Office, in conjunction with the report
25   that you filed, and turned into the State Attorney's
```

1    Office?

2        A.   Yes.

3        Q.   Was anything concealed from the State

4    Attorney's Office with regard to any of that evidence?

5        A.   No.

6        Q.   Turning to your report, Exhibit Number 2, on

7    Page 15 of that report, describing the crime scene --

8        A.   Yes.

9        Q.   -- the last paragraph on that page, will you

10   publish it, please?

11       A.   "The green Chevrolet Tahoe had two visible

12   impact points in the front passenger side windshield.

13   The projectile strikes on the front windshield were from

14   front to back, and left to right, when looking at the

15   vehicle.  The two front tires of the Tahoe were angled

16   to the right.  (Refer to pictures.)  The Tahoe's front

17   right wheel was against the parking lot curb.  Physical

18   damage was also noted on the green Tahoe.  There were

19   numerous dents, scratches and physical damage to the

20   vehicle, which appeared to be old damage."

21       Q.   Is that information contained in that paragraph

22   consistent with the evidence that we've discussed this

23   morning?

24       A.   Yes.

25       Q.   Now, Let me refer you to the paragraph

1    immediately above that, on the same page of Exhibit 2.

2         A.   Yes.

3         Q.   Would you publish that paragraph, please?

4         A.   "A green colored Chevrolet Tahoe (VIN Number

5    1GNEK13R0TJ422002) was positioned at the north entrance

6    to the parking lot of the Weis Center.  The vehicle was

7    directed in a southeast direction.  The green Tahoe's

8    engine was running, the driver's side window was in the

9    down position, and the driver's side door was open.  The

10   vehicle was still in the drive position upon initial

11   detective's arrival."

12        Q.   Referring you to Exhibit Number 18, which is

13   Detective Zorsky's Crime Scene Report, would you publish

14   the third paragraph on Page 2?

15        A.   "The green Chevrolet Tahoe (VIN Number

16   1GNEK13R0TJ422002) was positioned at the north entrance

17   to the parking lot of the Weis Center.  The vehicle was

18   pointing in a southeast direction.  The green Tahoe's

19   engine is running, the driver's side window is in the

20   down position, and the driver's side door is open.  I

21   was advised by Sergeant Salvat that the Tahoe was in

22   drive upon his arrival.  Sergeant Salvat directed ID

23   Tech Angel Ruiz to reach into the vehicle and put the

24   vehicle in park for officer safety."

25        Q.   Would you turn to Page 3 of that same exhibit,

1   18?

2        A.   Yes.

3        Q.   At the bottom of the page, 08:50 to 08:53

4   hours, would you publish what is written there?

5        A.   "Detective J. Perez rolled up the driver's side

6   window of the green Tahoe and turned off the engine.

7   The keys to the Tahoe were removed and impounded.

8   Detective Perez sealed the green Tahoe.  A tow truck was

9   requested to transport the green Tahoe to the Hialeah

10  Police sally port for processing.  Detective O.

11  Rodriguez followed the tow truck to the Hialeah Police

12  Department to ensure the vehicle was towed directly to a

13  covered parking area to the rear of the police station."

14       Q.   Now, based on the information contained in

15  those reports that you were receiving as part of your

16  investigation, the vehicle was still in drive at the

17  time of the incident and on the arrival of the initial

18  police officers, and the -- for officer safety, the

19  vehicle was taken out of the drive position and put in

20  the parked position, and it wasn't until 8:53 or so or

21  8:50, that the engine was actually turned off and the

22  keys were removed, correct?

23       A.   Correct.

24       Q.   Now, the manner of documenting what was done

25  with that vehicle, in terms of changing its condition

1   from the time of the incident to the time that the

2   report was done, is that routine and ordinary and is

3   there anything of a fabricated nature or an attempt to

4   manipulate evidence involved in doing that?

5       A.   No, it's routine.

6       Q.   Did that in any way change the conclusions that

7   you were reaching in connection with what occurred at

8   the shooting of this subject?  In other words, did the

9   fact that they turned off the engine of the vehicle

10  after the incident and put it into park, as opposed to

11  leaving it in drive, have any impact on the ultimate

12  determination that you made in connection with your

13  investigation of the shooting?

14      A.   No.

15      Q.   To your knowledge, were there any attempts by

16  any persons outside the Police Department, who were

17  attempting to influence the decision-making process or

18  an investigation in this case?

19      A.   I know we were getting -- information that was

20  being received about various leads that ended up being

21  nothing -- ended up being reported by Amy Burkich.

22      Q.   Turn to Exhibit 30.

23      A.   Yes.

24      Q.   Those are case notes that are part of the

25  Medical Examiner's file; is that correct?

1    A.    Yes.

2    Q.    Would you publish the note that was prepared by

3  Jennifer Park, of the Medical Examiner's Office, on

4  8/25/2009?

5    A.    "The time is 12:44 p.m.  I received a call from

6  AP Amy," spelled here, "Burkirich, (305) 669-4646, cell

7  (305) 244-4646, who is an attorney and family friend of

8  decedent.  Decedent's family would like to ask some

9  questions regarding the autopsy, and we have set up a

10  meeting for Wednesday, 8/26/2009, at 13:30, at the

11  Miami-Dade MEO.  I told Ms. Burkirich that the case is

12  under investigation and it is a police involved

13  shooting, so I can only answer questions regarding the

14  autopsy itself and not the undergoing investigation.

15  She understood.  She stated the family wanted some

16  questions answered, so they can bury their loved one.

17  She asked about a gunshot wound to the head.  I told her

18  that he was not shot in the head.  She asked if an X-ray

19  of the head was done, and I said that it was not, and my

20  autopsy examination would have been more thorough than

21  an X-ray and there was no gunshot wound of the head.

22  She said that she had gotten my number from another

23  family friend, Dr. Ariston Price (phonetic.)  She kept

24  reiterating the family just wanted their questions

25  answered, so they can finally put this case to rest."

1          Q.   And the next entry?

2          A.   "The time is 1:02 p.m.  After speaking with Dr.

3    Lou, I was told no information about the case, including

4    the autopsy findings, can be released to anyone without

5    consulting with the City of Hialeah PD.  I spoke with

6    Detective Elosegui (786) 564-2206, who told me he'd call

7    me back after speaking with the lead detective."

8          Q.   Publish the next note.

9          A.   "The time is 1:33 p.m.  Detective Proveyer

10   (786) 299-6329 called me regarding not releasing any

11   information on this case, because it is still under

12   active investigation.  He stated that Gail Levine, the

13   State Attorney, will be calling me, as well.

14   Ms. Burkirich told me that in order to cover myself, I

15   need to send her a letter stating that I originally set

16   up a meeting to discuss this case with the family and

17   herself, but that I was told afterwards that I am not

18   able to do so, because I was told by my supervisor, Dr.

19   Lou, and the police, that I cannot release any

20   information.  Ms. Burkirich stated that she was furious

21   and believed there is some kind of coverup, because she

22   knows the family and the decedent and that he is a good

23   kid, who wouldn't commit a crime.  After consulting with

24   our operations director, Mrs. Cameron --"

25         Q.   Mr. Cameron.

```
 1        A.   Mr., I'm sorry -- "Mr. Cameron, I was told that
 2   because this case is under active investigation by the
 3   State Attorney's Office and the police, in accordance to
 4   Florida State Law, I cannot release any information and
 5   to not have any communication with Ms. Burkirich,
 6   including not sending out the letter that she had asked.
 7   I told them I would be in compliance with the Florida
 8   State Law, until I'm told otherwise by the police and
 9   the State Attorney's Office."
10        Q.   Do you have any personal recollection of that
11   incident?
12        A.   I remember we were receiving numerous
13   information, either through the State or the ME, about a
14   lot of allegations.  We were doing a lot of running
15   around.  So I remember having called Dr. Park and
16   telling her, you know, not to release anything about the
17   decedent to anybody that called.
18        Q.   Do you remember receiving any phone calls from
19   the State Attorney's Office, from Gail Levine,
20   concerning the fact that there was an allegation that
21   the decedent may have been shot in the head?
22        A.   I don't remember that.
23        Q.   In the course of the investigation, did Amy
24   Burkich's name come up?
25        A.   Yes.
```

1    Q.   Referring to Exhibit Number 2, which is your

2  report, on Page 10 of that document --

3    A.   Yes.

4    Q.   -- would you publish what is written concerning

5  Amy Burkich?

6    A.   "Amy Burkich advised she was a friend of the

7  decedent's family and that she was an attorney.  The

8  decedent's cellular telephone revealed a phone call

9  placed to Ms. Burkich on August 19, 2009 at 3:18 a.m.

10 She stated she had no idea why the decedent would call

11 her at that time.  She never spoke with the decedent.

12 Ms. Burkich had no idea why the decedent was in Hialeah

13 and stated it (sic) was surprised to learn the decedent

14 was involved in a burglary."

15   Q.   So based on your investigation of cell phone

16 records from the decedent's cellular telephone, he had

17 called her approximately an hour and fifteen minutes

18 before this burglary was taking place?

19   A.   Yes.

20   Q.   At 3:18 a.m.?

21   A.   Yes.

22   Q.   And there was no explanation given, correct?

23   A.   No.

24   Q.   Did anybody from -- strike that.

25        Did you in any way attempt to influence the

1   outcome of the State Attorney's determination as to the

2   disposition of this case?

3        A.   No.

4        Q.   Other than indicating that your opinion was

5   that the case should be cleared and that no -- and that

6   the shooting was justified, was there any attempt on

7   your part to change a position of any Assistant State

8   Attorney who may have represented a contrary view?

9        A.   No.

10        Q.   Were you aware of any contrary view being

11   expressed by the State Attorney's Office?

12        A.   No, I was not.

13        Q.   Now, there has been some intimation in the

14   course of the litigation of this case that the decedent

15   was outside the vehicle, rather than inside the vehicle,

16   at the time the shots were fired, and that there was no

17   evidence of blood inside the vehicle with which to

18   establish that the shooting had taken place while the

19   decedent was, in fact, driving the vehicle.

20        Did you find that that evidence -- did you find

21   that your evidence was consistent with that allegation

22   or contrary to that allegation?

23        A.   Contrary.

24        Q.   Let me show you a series of photographs,

25   starting with Exhibit 31-A, proceeding through 31-F,

1    that show the scene and some physical evidence at the

2    scene.  Can you tell us what's revealed by those

3    photographs and what your observations were at the scene

4    and whether they were consistent or inconsistent with

5    those photographs?

6         A.   Exhibit 31-A is a photograph taken from the

7    cellular store, facing an easterly direction, towards

8    Palm Avenue.  It's depicting the parking lot, Officer

9    Barrios' vehicle, the green Chevrolet Tahoe.  You can

10   still see some blood stains on the ground, next to the

11   passenger side door of Officer Barrios' vehicle, and the

12   area is cordoned off by yellow crime scene tape.

13        Q.   That photograph, Exhibit 31-A, shows the

14   relative positions of the vehicles at the time of -- the

15   vehicle came to rest; is that correct?

16        A.   Yeah, in the same positions as when detectives

17   arrived.

18        Q.   Okay.  Next photograph?

19        A.   Exhibit 31-B is a closeup of the aforementioned

20   blood on the ground, next to the passenger side door of

21   Officer Barrios' vehicle.  There's a Marker Number 3 for

22   a Newport cigarette and a Marker Number 4 for the blood.

23        Q.   Actually, when you say, "Next to the driver's

24   side door," it's actually --

25        A.   Passenger's.

```
 1          Q.    Excuse me, the passenger's side door, it's
 2   actually to the west-northwest, approximately, of the
 3   front end of that vehicle; is that correct?
 4          A.    Correct.
 5          Q.    Okay.  And Exhibit 31-C?
 6          A.    31-C is a closeup of Marker Number 4, the pool
 7   of blood west-northwest of Officer Barrios' vehicle.
 8          Q.    And it also shows its relationship to the front
 9   passenger side tire of the vehicle -- of the police
10   vehicle, correct?
11          A.    Correct.
12          Q.    The next exhibit, Exhibit 31-D?
13          A.    31-D is depicting a blood stain under the front
14   right tire of Officer Barrios' vehicle.
15          Q.    When you say, "Under," it's to the right, as
16   you face in the direction of the vehicle's front end,
17   correct?
18          A.    Correct.
19          Q.    Next photograph?
20          A.    31-E is depicting Markers 3, 4 and 7.  It's a
21   different angle of the same blood stains we were talking
22   about.
23          Q.    And it shows the relationship of those blood
24   stains to the police vehicle of Officer Barrios,
25   correct?
```

1       A.   Yes.

2       Q.   And 31-F?

3       A.   It's Markers Numbers 1 and 7, also in relation

4  to Officer Barrios' vehicle and the green Chevrolet

5  Tahoe.

6       Q.   So it shows the relationships of some of those

7  blood stains and also the casing -- the bullet casing,

8  Marker 1, with relationship to both vehicles, correct?

9       A.   Correct.

10       Q.   Let me show you now Composite Exhibit Number

11  32, which consists of Photographs 32-A, 32-B, 32-C,

12  32-D, 32-E, 32-F, 32-G.

13       A.   32-A is a photograph of Mr. Arias.

14       Q.   And it shows his head is against the curbstone

15  to the north of the exit of the parking lot, correct?

16       A.   Yes.

17       Q.   And it shows him lying in a north/south

18  direction, more or less?

19       A.   Yes.  You can also see the wheels of a fire

20  rescue truck at the top of the photograph.

21       Q.   And that would be on the side that would be

22  closest to the police vehicle; is that correct?

23       A.   Yes, and the sidewalk.

24       32-Bravo, Mr. Arias is no longer on the scene,

25  and it's the pool of blood, also in relation to the rear

```
 1   right tire of Officer Barrios' vehicle.
 2        Q.   And that's in the location approximately
 3   underneath where his body was resting?
 4        A.   Yes.
 5             32-C is depicting two blood marks on the
 6   ground, apparent to be the stretcher -- the wheels of
 7   the stretcher, as the body is being removed, passing
 8   over blood.
 9        Q.   So that would have been on the sidewalk area
10   towards Palm Avenue, correct?
11        A.   Yes.
12             32-D, pictures of a -- same type of markings,
13   wheel blood stain from a stretcher wheel.
14             32-E, the same, but in relation to a yellow
15   curb.
16             32-F, the same, from a different angle.
17             32-G, back to the blood stains in relation to
18   the yellow curb.
19        Q.   So we have two blood trails, in essence?  We
20   have one blood trail that is somewhere between the Tahoe
21   and the curbstone to the east of the police vehicle,
22   correct?
23             MR. KRUEGER:  Read it back.
24             (Thereupon, said portion was read back by
25        the reporter, as above recorded.)
```

```
 1              THE WITNESS:  Yes.
 2   BY MR. KRUEGER:
 3       Q.   And we have a second blood trail that leads
 4   from the aforementioned -- strike that.
 5              The first blood trail that we described also
 6   leads to the area where the body was located at the time
 7   of the arrival of the police, correct?
 8       A.   Yes.
 9       Q.   And then we have a second blood trail that
10   leads somewhat from the position of that body, to the
11   Palm Avenue side of the street, where apparently the
12   stretcher indicates he had been removed by the fire
13   rescue, correct?
14       A.   Yes.
15       Q.   Now, let me show you a series of photographs,
16   starting with -- actually, one photograph, from a
17   composite, 38-A.  Is there any indication in that
18   photograph -- first off, what is that a photograph of?
19       A.   It's a photograph of the interior of the green
20   Chevrolet Tahoe, taken from the -- from an open driver's
21   door.
22       Q.   Is there any indication of blood in that
23   vehicle?
24       A.   Yes, there's blood on top of a cellular phone
25   case, next to the center console.
```

```
 1        Q.   And that's on the passenger side of the
 2   vehicle?
 3        A.   It's in the center.
 4        Q.   Okay.  Let me show you a series of exhibits,
 5   starting with 19 and running through 23.  Can you
 6   describe what those exhibits indicate?
 7        A.   Exhibit 19 is the interior of the green
 8   Chevrolet Tahoe, a closeup of the steering wheel, with
 9   blood stains on it.
10        Q.   On what side of the steering wheel?
11        A.   On the right side.  You can see the gear
12   shifter in the distance -- in the background, rather,
13   and the key is in the ignition.
14        Q.   What is the next photograph?
15        A.   Exhibit 20, the interior of the green Chevrolet
16   Tahoe, near the glove compartment, blood stains.
17        Q.   Where?
18        A.   On the glove compartment itself.
19        Q.   On the dashboard?
20        A.   And on the dashboard.
21        Q.   Was there an air conditioning vent there?
22        A.   Yes, just left of the glove compartment, that
23   also had blood stains on it.
24             Exhibit 21 is the floorboard of the driver's
25   side, the floor mat and the rug with blood stains.
```

1          Exhibit 22 is a closeup of the cellular

2    telephone box, on top of the center console, with blood

3    stains on it.

4         Q.   And is the blood dripping down onto the center

5    console?

6         A.   The blood is dripping down onto the driver's

7    seat -- the right portion of the driver's seat.

8         Q.   Exhibit 23?

9         A.   23 is a closeup of the open driver's door, with

10   the blood stain near the bottom compartment of the

11   interior door.

12        Q.   Okay.  Let me show you Exhibit 18, again.  This

13   is Detective Zorsky's Crime Scene Report.  On Page 2, at

14   the bottom, is there any reference to the blood that was

15   found at the scene?

16        A.   Yeah, described as Marker Number 4.  Blood

17   swab, at 8:23, located on ground, photographed and

18   impounded.

19        Q.   Turning to the next page, Page 3 of Exhibit 18,

20   is there any reference to blood trail evidence?

21        A.   Described as Marker 7, blood trail in front of

22   Unit 2710, and then gives its positioning,

23   29-feet-6-inches from building east wall, west to east

24   and 29 feet from the lightpole north of building wall,

25   north to south.

1      Q.   There's also a reference to that at the top of

2   the page, isn't there?

3      A.   Yes.  Marker 7, blood trail swab at 8:26, on

4   the ground, on the ground from Tahoe to Unit 2710,

5   photographed and impounded.

6      Q.   Referring to Exhibit Number 5.  That is the

7   Crime Scene Report; is that correct?

8      A.   Yes, this is the one authored by actual CSI

9   personnel.

10      Q.   And if -- referring to Page 3 -- strike that.

11           Yeah, 3, under "Scene Processing Evidence," is

12   there any reference to the blood that was found in the

13   parking lot?

14      A.   It's described as Marker 4, possible blood

15   found in parking lot area; and Marker 7, possible blood

16   drops on pavement by the parking lot from subject

17   vehicle to where subject was treated by paramedics.

18      Q.   And the next page, under Serological and Trace

19   Evidence," which is Page 4, is there any reference to

20   the blood found in the parking lot areas?

21      A.   DNA swabs were collected at 8:23 from possible

22   blood found in parking lot area of 494 Palm Avenue,

23   Marker Number 4.  8:26 possible blood found in the

24   parking lot area of Marker Number 7.

25           There's another reference, but it doesn't --

1     Q.   Okay.  Now, on Exhibit Number 2, turn to Page

2   16, the "Inside Scene" at 494 Palm Avenue --

3     A.   Yes.

4     Q.   -- was there evidence of a burglary at that

5   location?

6     A.   Yes.

7     Q.   Okay.  Would you publish what is written under

8   "494 Palm Avenue - Inside Scene"?

9     A.   "Jobay Cellular, 494 Palm Avenue, was the

10   northern most store of the Weis Center.  The business'

11   front glass door was broken.  The business had a front

12   store area and a rear area where there was a bathroom

13   and a small employee type lounge.  The front store area

14   had three adjoining display cases.  The first display

15   case was closest to the front door, the second faced the

16   north side of the business and the third was furthest

17   from the front door.  The glass of the first and the

18   second display cases were broken.  There was suspected

19   blood on the glass of the display case closest to the

20   front door.  There was a black and silver bat laying

21   (sic) on the floor near the first and second display

22   cases as you entered into the business.  There were

23   boxes of cellular phones in the display cases and on the

24   floor.  There were several bills of U.S. currency on the

25   ground near the front door and near the display cases.

1  There was a free standing counter and desk behind the

2  third display case.  There was a trash can next to the

3  desk.  A Razor cellular telephone box was inside the

4  trash can.  The rear area of the business appeared to be

5  undisturbed.

6      Q.   Referring you to Exhibit Number 18, which is

7  Detective Zorsky's Crime Scene Report, at the bottom of

8  the page, would you publish --

9      A.   Which page?

10     Q.   Page 4.

11     A.   Okay.

12     Q.   At the bottom of the page, "The owner --"

13     A.   Uh-huh.

14     Q.   Would you publish that?

15     A.   "The owner of the business, Mr. Pablo Jo,

16  arrived on the scene.  He advised that he had a box,

17  which contained about 70 U.S. dollars, inside the

18  free-standing counter behind the display cases."

19     Q.   Was there a metal cash box found in the Tahoe?

20     A.   Yes.

21     Q.   Referring you to Exhibits 36-A and 36-C, which

22  show a series of photographs after removal of items, to

23  reveal what is under them, does that indicate where the

24  cash box was located?

25     A.   Yes.  Exhibit 36-A depicts the inside of the

```
 1   green Chevrolet Tahoe, the photograph taken from an open
 2   passenger -- front passenger side door, several cell
 3   phone boxes on the passenger floorboard.
 4        Q.   They would conceal -- they conceal whatever is
 5   underneath them; is that correct?
 6        A.   Yes.
 7             Then, actually, 36-B, from a different angle,
 8   depicts the gray metal box under a cell phone box, and
 9   36-C is a free and clear picture of the metal box, once
10   the cell phone box had been removed.
11        Q.   Now, those cell phone boxes are associated with
12   the cell phone store, correct?
13        A.   Yes.
14        Q.   Was there also a cell phone located in the
15   parking lot?  Let me refer you to Exhibit 37, which is a
16   reference to Marker Number 5.
17        A.   Yes.
18        Q.   And that's the cell phone box and cell phone
19   that were found in the parking lot area, correct?
20        A.   Yes.
21        Q.   If I refer you to Pam Zorsky's report, Exhibit
22   18, the last page, there's a diagram, although it's not
23   drawn to scale or it indicates it's not drawn to scale,
24   there is an indication of where each of the markers were
25   found, relative to the parking lot and the vehicles; is
```

1    that correct?

2         A.   Yes.

3         Q.   And where was Marker 5 found?

4         A.    In the parking lot, in between Officer Barrios'

5    vehicle and the shopping center, the actual structure.

6         Q.   Exhibit 34, does that indicate anything about

7    the contents that had been removed from the cell phone

8    store and its relationship to the Chevy Tahoe?

9         A.   The same type of cell phone boxes and makes and

10   brands from inside the store, from the floor -- from the

11   ground, in the parking lot.

12        Q.   Is there also cash intermingled with those

13   boxes, and coins?

14        A.   Yes, cash and coins on the floorboard.

15        Q.   I'm showing you what's been marked as Exhibit

16   38-A and 38-B.  Does that indicate the same thing?

17        A.   38-A, from a different angle, from the driver's

18   side, you can see more cash on the floorboard of the

19   green Chevrolet Tahoe.  And 38-B is a closeup of the

20   cash and change on the passenger side floorboard, from

21   inside the vehicle, scattered throughout, and coming out

22   onto the step.

23        Q.   Was any of the photographs evidence that we've

24   looked at this morning or examined fabricated or staged

25   to provide a misrepresentation of what occurred on

 1   August 19th, 2009?

 2        A.   No.

 3             MR. KRUEGER:  I have no further questions.

 4             MR. MARTINEZ:  Well, it's one o'clock.

 5        What do you want to do?

 6             (Discussion off the record.)

 7             (Thereupon, Exhibits 40-A, 40-B, 40-C were

 8   marked for Identification.)

 9             (Lunch recess from 1:00 p.m. to 2:10 p.m.)

10             MR. KRUEGER:  Back on the record.

11   BY MR. KRUEGER:

12        Q.   Referring you to Exhibits 25 and 26 --

13        A.   25 and 26?

14        Q.   Yes.

15        A.   It's a worksheet.

16        Q.   25 and 26 are Patrol Status Sheets?

17        A.   Yes, sir.

18        Q.   And those are documents which indicate what the

19   unit numbers were of the officers that we're making

20   reference to in this case?  For example, McIntyre is

21   2300 on the sheet?

22        A.   Yes.  This is a status sheet for Sector 1 and

23   Sector 2.  At that time, Sector 2 administratively

24   handled the attendance for the lieutenant.  That's why

25   he's on there.

```
1         Q.   Okay.  And the other officers are indicated on
2    Exhibit 25?  We've got Gonzalez, we've got Acosta and
3    we've got Barrios, correct?
4         A.   Yes.
5         Q.   And their unit numbers are all indicated on
6    those sheets, correct?
7         A.   Yes.
8         Q.   Let me show you what's been marked as Exhibits
9    40-A, B and C, the interior of the mobile phone store.
10   Is that the scene that you observed on the night in
11   question?
12        A.   Yes.
13        Q.   And what does the first exhibit show, 40-A?
14        A.   Exhibit 40-A is a photograph taken from inside
15   the store, facing eastbound towards the front door and
16   parking lot.  It shows the front glass door is
17   shattered.  The glass --
18        Q.   You can see pieces of the glass still in the
19   frame of the door; is that correct?
20        A.   Yes.
21        Q.   And through the door, you can see the police
22   car?
23        A.   Yes.
24        Q.   That's Officer Barrios' car?
25        A.   Yes.
```

1        Q.   Okay.  What is Exhibit B?

2        A.   Exhibit 40-B is a photograph of the interior

3    store, taken westbound.  It shows a broken display --

4    broken glass display cases, a metal bat on the floor,

5    U.S. currency on the floor, cell phone boxes on the

6    floor.

7        Q.   Okay.  And do those cell phone boxes match or

8    they similar in appearance to the phone boxes that are

9    in the vehicle, the Tahoe that's in the parking lot?

10       A.   Yes, same makes.

11       Q.   And Exhibit 40-C?

12       A.   40-C is a closeup of the bat, on the floor,

13   inside Jobay Cellular.

14       Q.   And that was assumptively used to smash the

15   door and the glass cases?

16       A.   Yes.

17            MR. KRUEGER:  No further questions.

18                      CROSS EXAMINATION

19   BY MR. MARTINEZ:

20       Q.   Okay.  Is it Officer now or Detective or are

21   you back in patrol --

22       A.   Sergeant.

23       Q.   Oh, Sergeant.  I'm sorry, correct, Sergeant.

24            When were you promoted?

25       A.   September 2010.

```
1        Q.   Congratulations.

2        A.   Thank you.

3        Q.   Okay.  Let me go through a few questions as

4   quickly as I can.  Are you familiar with the Hialeah

5   Police Department's procedures on when an officer can or

6   cannot or when he's trained to be able to shoot or fire

7   his firearm?

8        A.   Yes.

9        Q.   Is there a procedure?

10       A.   Yes, there's General Orders and --

11       Q.   Okay.  What are General Orders?  When you said,

12   "General Orders," what does that mean?

13       A.   Specific rules and regulations governing our

14   conduct.

15       Q.   Are those written?

16       A.   Yes.

17       Q.   Okay.  Are you familiar with those General

18   Orders with regards to -- so we can speed it up, with

19   regards to firing your side arm or your firearm?

20       A.   Verbatim?  Do I need the General Orders in

21   front of me or --

22       Q.   No, your interpretation, what you believe.

23            MR. KRUEGER:  I have an objection, because

24       the General Orders weren't, I don't believe, in

25       effect in 2009 when this --
```

```
 1              MR. MARTINEZ:  I don't know.  Were they?
 2  BY MR. MARTINEZ:
 3       Q.  Were they in effect at the time of the
 4  shooting?  Do you know?
 5       A.  I'd have to see.
 6              MR. KRUEGER:  They may have been
 7         Administrative Orders.  I believe they probably
 8         were Administrative Orders rather than General
 9         Orders, because General Orders were started
10         fairly recently.  I don't know exactly what the
11         date of the General Order dealing with whatever
12         subject you're going to get into was
13         promulgated, without having the order in front
14         of us or without having the Administrative
15         Order in front of us.
16              MR. MARTINEZ:  I'm asking him what he
17         remembers.
18              MR. KRUEGER:  Fine.
19  BY MR. MARTINEZ:
20       Q.  Answer to the best of your ability.  We'll go
21  one by one.  Whether it was a General Order at the time
22  or what you know a General Order to be, we can go
23  through Administrative Orders, if that's what it was
24  called at the time, we can go through what you believe
25  it to be, what your understanding was.
```

1      A.   Referring to specifically firing -- the

2   discharge of a firearm?

3      Q.   Correct.

4      A.   Deadly force.

5      Q.   You tell me.  What is your understanding of the

6   policy of when you can fire a firearm?

7      A.   When the use of deadly force is warranted,

8   either because your life or the life of another is in

9   danger.

10     Q.   Okay.  Is that the extent of it?

11     A.   I mean, without the General Order or

12  Administrative Order, whatever was in effect, in front

13  of me, that pretty much sums it up.

14     Q.   Okay.  Whatever order, we're talking about a

15  written order?

16     A.   Yes.

17     Q.   Okay.  So something that was in writing that

18  you've seen.

19          When was the first time that you remember

20  seeing that written order or something in writing

21  regarding the policy for discharging your firearm?

22     A.   In the Hialeah Police Department?

23     Q.   Yes.

24     A.   Within my first month here.

25     Q.   Like --

```
 1        A.    Like November 2002.

 2        Q.    Immediately out of the academy?

 3        A.    Well, I worked for another department, so I saw

 4   it in that department, too.

 5        Q.    Okay.  But in Hialeah?

 6        A.    Hialeah, November of 2002.

 7        Q.    I have no issues with any other department

 8   today.  November of 2002.  When was the next time, if

 9   ever, that you remember referring to those orders, those

10   written orders, if ever?

11        A.    Occasionally, every couple of years, they

12   renew the order, update it, and you review the whole

13   thing and there it is again.  Specifically, I remember

14   reading it studying for the sergeant's test.

15        Q.    Okay.  So when you studied.  Now, my question

16   more specifically is, do you remember the Department

17   ever giving you that order and making you sign a

18   document or something showing that you, in fact, have

19   read that order on a regular basis?

20        A.    The -- some administrative things changed in

21   the Department.  At one point, when you were issued a

22   General Order, you had to sign for it.  Other times, you

23   opening up the e-mail with the General Order in it was

24   like your signed receipt that you opened it.

25        Q.    Okay.  What about training, did they ever give
```

```
 1    you guys training on what exactly that order means or
 2    what you should do when you're in the field in the heat
 3    of the moment?
 4         A.   We've got use of force training.
 5         Q.   How often do you have that use of force
 6    training?
 7         A.   Again, I'm not in the training section, but
 8    once or twice a year.
 9         Q.   Is it mandatory?
10         A.   Yes.
11         Q.   Okay.
12         A.   And for sure once a year, because it covered
13    under the taser.  When you renew your taser
14    certification, they cover the use of force, the policy.
15         Q.   And the use of force policy includes the
16    discharging of the firearm?
17         A.   Yes.
18         Q.   Is everybody in the Department taser certified?
19         A.   Yes.
20         Q.   What about unwritten policies or unwritten
21    orders, is there any training done by your supervisors
22    or -- I wouldn't want to call it orders, but examples or
23    advice given by the supervisors to the officers that are
24    working beneath them, let's say, FTOs, LTs, majors,
25    anything like that?  Is there any unwritten orders or
```

```
 1   policies in the Department about when you can fire your
 2   firearm?
 3            MR. ANTONELLI:  Object to the form.
 4   BY MR. MARTINEZ:
 5        Q.   You can answer.  He's just objecting.
 6        A.   Not that I'm aware of.
 7        Q.   Is there any policy on what use of force you
 8   can use as an officer on a fleeing felon?
 9        A.   Yes.
10        Q.   Okay.  And what's that policy?
11        A.   I don't remember.
12        Q.   All right.  Do you have any idea what is the
13   policy on what to do when an officer in the field
14   encounters a fleeing felon?
15        A.   In relation to the use of force --
16        Q.   No, just in general.  What is the policy on a
17   fleeing felon?
18            MR. ANTONELLI:  Object to the form.
19            THE WITNESS:  I'm not sure.
20   BY MR. MARTINEZ:
21        Q.   Okay.  We'll take it one by one.  How about a
22   fleeing felon on foot, is there any policy as to whether
23   you can shoot him, tase him, throw your baton at him?
24   What's the policy if there is fleeing felon on foot?
25        A.   I'm not sure.
```

1      Q.   Okay.  What about a fleeing felon in an

2   automobile, let's say, a car chase, is there a policy on

3   that?

4      A.   There is a chase policy.

5      Q.   Okay.  What's the chase policy?

6      A.   During the time of this incident or --

7      Q.   Yeah, let's stick to the time of this incident,

8   to the best of your knowledge.  I'm sorry, to the best

9   of your knowledge.

10      A.   For a vehicle pursuit, at the time of this

11   incident, it had to be a violent felony to justify a

12   chase.

13      Q.   Did they train you on what constituted a

14   violent felony?

15      A.   It was listed in one of the GOs or the AOs,

16   whatever was in place at the time.

17      Q.   Do you remember if a burglary would be a

18   violent felony?

19      A.   During the time of this incident, no.

20      Q.   No, you don't remember or --

21      A.   It was not listed as a violent felony.

22      Q.   Is it today?

23      A.   Burglary is listed now as a forcible felony and

24   we can now chase a forcible felony.

25      Q.   But not back then?

```
1          A.   No.  I'm talking about a vehicle pursuit.

2          Q.   Okay.  Yes.  Yes.

3               Was there any policy back then with regards to,

4     since you mentioned it, a forcible felony, that you're

5     aware of?

6          A.   I don't know.

7          Q.   Okay.  What about today, do you know any

8     policies, in general, with regards to a forcible felony?

9          A.   I only recall about a vehicle pursuit.

10         Q.   Okay.  And getting back to the vehicle pursuit,

11    are you allowed to strike the vehicle, even if it's a

12    violent felony that you're in pursuit of or are you just

13    supposed to pursue?

14         A.   If you're certified as a PIT maneuver and it's

15    been authorized by the supervisor or the shift

16    commander.

17         Q.   And that would be at the time of the incident?

18         A.   No.

19         Q.   All right.  He would authorize it well in

20    advance, based on your training, you're telling me?

21         A.   At the time of this incident?

22         Q.   No.  Maybe it's me.  Let me correct my

23    question.

24              And the Pittman Maneuver you're referring to is

25    when you strike the vehicle with your vehicle, right?
```

```
 1        A.    In a certain manner to safely end the chase.
 2        Q.    So with regards to -- now the policy is that
 3   you can pursuit a vehicle if you believe the person
 4   driving it committed a violent felony?
 5        A.    Forcible.
 6        Q.    And you stated that if you've been trained and
 7   your supervisor authorizes it, you can perform the
 8   Pittman Maneuver, which is the striking of the vehicle?
 9        A.    Yes.
10        Q.    When do you get that authorization?  Do you get
11   it, in general, at the time of training or do you have
12   to ask for the authorization at the time of pursuit?
13        A.    Time of pursuit, either ask or the shift
14   command will order it.
15        Q.    Okay.  But you don't have like a widespread
16   approval to do a Pittman Maneuver just on your own, even
17   if you've been trained?
18        A.    No.
19              MR. KRUEGER:  A general objection to the
20         form of this line of questioning.
21   BY MR. MARTINEZ:
22        Q.    Was there a policy at the time of the
23   incident -- and by the way, so we can be clear, of the
24   policies that I'm asking you, in general, I'm asking at
25   the time of the incident.  If the policy has changed
```

```
1   since the time of the incident, just suffice it you can

2   tell me the policy has changed since the time of the

3   incident.

4        A.   Okay.

5        Q.   At the time of the incident, were you ever

6   trained or is there a policy on firing your firearm into

7   the windshield of a vehicle?

8        A.   We were not trained.

9        Q.   And there's no policy?

10        A.   There is a policy and there was a policy about

11   shooting at a moving vehicle.

12        Q.   Okay.  What was that policy, to the best of

13   your knowledge?

14        A.   To the best of my knowledge, summarizing it,

15   it's to be avoided, unless there's a -- you're in fear

16   for your own life or the life of others.

17        Q.   Okay.  And this was a written policy?

18        A.   Yes.

19        Q.   Do you remember, is it General Orders,

20   Administrative Orders?

21        A.   I don't remember when we switched to General

22   Orders.

23        Q.   Okay.

24        A.   One or the other.

25        Q.   But it was written somewhere?
```

```
 1        A.   Yes.

 2        Q.   Okay.  Has that policy changed?

 3        A.   No.

 4        Q.   Okay.  Were you trained on that policy?  In

 5   other words, did they train you on what is a situation

 6   that you can avoid or how to try to avoid that

 7   situation?

 8            MR. ANTONELLI:  Object to the form.

 9            THE WITNESS:  When new GOs are covered,

10        it's covered.  I remember the old.  In the new,

11        it states about not to put yourself in that

12        position.

13   BY MR. MARTINEZ:

14        Q.   What do you mean by not to put yourself in the

15   position?  Explain that.

16        A.   Not to put yourself in a position where you had

17   to put yourself in danger with a moving vehicle.

18        Q.   Okay.  So in other words, correct me if I'm

19   wrong, what you're saying is that you've been trained

20   not to get in the way of a moving vehicle?

21        A.   By trainings, we're not talking about a field

22   exercise where we're practicing it on the field.  We're

23   talking about a supervisor covering it with his

24   subordinates.  Pretty much you're reading it to them, to

25   make sure that they got the point.
```

```
 1       Q.   I got it.  Yeah, you're not doing any field

 2  exercise, but they're trying to explain to you what that

 3  written order actually means?

 4       A.   Yes.  It's covered that you're not to put

 5  yourself in that position; however, if you find yourself

 6  in that position and you're in fear, you're authorized

 7  to use deadly force.

 8       Q.   Okay.  Would it be fair to say what they

 9  said -- what you were instructed to do, when they said

10  not to put yourself in that position, it means, do not

11  put yourself in the harms way?  Is that a fair

12  statement?

13       A.   Yes.

14       Q.   And this was in place at that time?  I'm sorry,

15  I forgot.

16       A.   The part I remember about the current policy is

17  not to put yourself in harm's way.  I don't remember

18  back then if it actually had that paragraph.

19       Q.   Okay.  Let me jump to the incident one second.

20  I'm going through the policy stuff first, but before I

21  forget, so since you're not sure if it was a policy back

22  then, is it safe to say you didn't consider -- you

23  didn't even consider whether or not Officer Barrios had

24  (A) been able to avoid the vehicle?

25            MR. ANTONELLI:  Object to the form.
```

```
 1              MR. KRUEGER:  Object to form, relevancy.
 2   BY MR. MARTINEZ:
 3        Q.   Right?
 4        A.   Answer?
 5        Q.   Yes, you can answer.
 6        A.   This is why on the report, based on the
 7   physical evidence, where I mentioned the vehicle was
 8   here or the vehicle was positioned looking at the store,
 9   to the right, and you had the bush and the curb to the
10   left, that's why I mentioned, conceivably, if he was in
11   the middle, it wasn't that he put himself there, it's
12   that he's in this tunnel of death, per se, when the car
13   is coming at him.  That's how I justified that.
14        Q.   I get all that.  My question, more
15   specifically, is, did you ever consider, as you're
16   investigating this, is it possible -- was it possible
17   for Barrios to get out of harm's way?
18              MR. ANTONELLI:  Object to the form.
19              MR. DESAI:  Object to the form.
20   BY MR. MARTINEZ:
21        Q.   They objected, but you have to answer anyway.
22        A.   Again, Officer Barrios didn't give me a
23   statement.  I had to do it with what I was dealt.
24        Q.   I understand.
25        A.   And as far as policy, in Homicide, we don't
```

```
 1   deal with policy, that's Internal Affairs.  We deal with
 2   the more criminal portion.
 3       Q.   Okay.  So then let me ask the second part,
 4   which they're going to object, but you have to answer,
 5   is, did you consider whether or not he actually put
 6   himself in harm's way?
 7            MR. ANTONELLI:  Object to form.
 8            MR. KRUEGER:  Form.
 9            THE WITNESS:  I believe -- I'm trying to
10       answer this specifically.  Yes, I considered
11       it.  I didn't think he had.
12   BY MR. MARTINEZ:
13       Q.   Okay.  Thank you.
14            MR. ANTONELLI:  Just as a heads up.  He
15       gets to ask questions.  If we were in a
16       courtroom and a Judge was present, he'd ask the
17       question, we'd object, the Judge would rule,
18       and would then tell you whether or not to
19       answer.
20            In a deposition setting, he asks the
21       question, we get to object, the Judge rules at
22       some other point in time, you get to answer,
23       unless for some reason someone tells you not to
24       answer.
25   BY MR. MARTINEZ:
```

```
 1        Q.   I may or may not be able to ask you this
 2   question the same exact way in court, so that's what
 3   they're objecting to, but I can ask it here today.
 4        A.   Okay.
 5        Q.   Since you talked about Officer Barrios, that's
 6   another question I want to ask you, touch on that
 7   briefly, so that we're clear.  Officer Barrios never
 8   made a statement, right?
 9        A.   No.
10        Q.   Okay.  From your days in the academy to the
11   present, has there ever been an official policy on what
12   officers should do, as far as statements, when they're
13   involved in a police shooting?  In other words -- let me
14   clarify it a little better, sorry.
15           Has there ever been a policy, that you're aware
16   of, from your days in academy to present, has there ever
17   been a policy telling you whether or not you should make
18   a statement when you're involved in a police shooting?
19           MR. ANTONELLI:  Object to the form.
20           THE WITNESS:  No, there's no policy.
21   BY MR. MARTINEZ:
22        Q.   Have you ever been told by any of your
23   supervisors what to do if you're involved in a police
24   shooting?
25        A.   In an official capacity?
```

1          Q.   Let's start with the official capacity.

2          A.   No.

3          Q.   Okay.  Let's go with the unofficial capacity.

4          A.   I've been told, "Wait for your attorney or your

5     Union representative."

6          Q.   In other words, you've been told, "Don't say

7     anything until your attorney gets here"?

8          A.   Unless it's something urgent that needs to be

9     clarified, like, you know, there's another subject at

10    large.

11         Q.   But nothing about the actual shooting, who you

12    fired upon?

13         A.   No.

14         Q.   Have you ever been -- let's start with the

15    official.  Has there ever been an official written

16    policy on, if you're involved a police shooting, to make

17    sure that you feel or state that you felt your life was

18    threatened?

19         A.   No.

20         Q.   Has there ever been an unofficial policy by any

21    of your supervisors, saying, "If you ever have to fire

22    your firearm, make sure you say that you felt your life

23    was threatened"?

24         A.   No.

25         Q.   At the time of the incident, what was the

```
 1   policy on -- if you want, we'll take it step by step.
 2   I'm going to make a broad sweeping statement and you
 3   take it from there.  If it's not too clear, we'll take
 4   step by step.
 5          At the time, what was the policy on a patrolman
 6   being dispatched to a burglary in progress?  Can you
 7   take me through the process of the officer on the road,
 8   when he gets a call from the dispatch, like in this
 9   case, to a burglary in progress?
10          MR. ANTONELLI:  Object to the form.
11   BY MR. MARTINEZ:
12       Q.  Do you want me to take it step by step?
13       A.  Yes.
14       Q.  Is there a policy on whether you should go with
15   lights and sirens?
16       A.  For an in progress call, no, no lights and
17   sirens.
18       Q.  Okay.  So the policy is, actually, no lights
19   and sirens, right?
20       A.  Correct.
21       Q.  Okay.
22       A.  If it's worded like that, a 26 in progress.
23       Q.  All right.  And do you know why that is?  Have
24   you been told why you should go with no lights and
25   siren?
```

1    A.   If was put out as a 26 in progress, it's not an

2    occupied dwelling, it's not something occupied.  There's

3    no --

4    Q.   I'm sorry, what is a 26 in progress?

5    A.   A burglary in progress.

6    Q.   Okay.  And that means no dwelling?

7    A.   Or no occupied -- there's no immediate life and

8    danger.  It's a property crime.

9    Q.   So the policy is no lights and sirens?

10   A.   Yes.

11   Q.   And why is that?

12   A.   Because there's not an immediate life -- threat

13   to life or harm.  It's a property call.

14   Q.   Were you able to determine, in this case,

15   whether Officer Barrios arrived without his lights and

16   sirens on, as part of your investigation?

17   A.   Nothing indicated he had lights on.  Well, you

18   know, for sure, the audio, on the tape, didn't have a

19   siren.  I don't remember right now the City Hall video.

20   I can't recall --

21   Q.   Okay.

22   A.   -- if he had has overhead lights on.

23   Q.   Okay.  So you heard the audio, though, and if

24   the siren was on, you would have heard the siren on the

25   audio?

1       A.   Yes.

2       Q.   And there was no siren on that audio?

3       A.   No.

4       Q.   What about, for this type of burglary, a 26, as

5  far as backup, is there a policy on whether the first

6  responder to the scene should wait for a backup or not?

7       A.   No, there's no policy on that.

8       Q.   Is there a policy on when you should, as an

9  officer, request backup?

10      A.   No.

11      Q.   In fact, in this case, Officer Barrios didn't

12 request a backup, two patrolman were sent out at the

13 same time, right?

14      A.   We routine -- most calls have two officers.

15      Q.   Now, is there an unofficial policy or any type

16 of training on whether officers should wait for backup

17 in a situation of a burglary?

18      A.   Every case is different, but in this case, no,

19 there's no official, you just go.

20      Q.   I'm assuming, at some point -- I'm sorry, were

21 you ever an FTO?

22      A.   Yes.

23      Q.   As an FTO, and that's -- for the record, what

24 is an FTO?

25      A.   Field training officer.

```
 1       Q.   As an FTO, when you were training the younger
 2   officers, did you give them your advice or your training
 3   or your ideas on whether they should or shouldn't wait
 4   for backup, in certain situations?
 5       A.   Yes.
 6       Q.   Is burglary one of those situations, when you
 7   were an FTO, when you would say, "Look, if nobody's life
 8   is threatened, you should wait for backup"?
 9       A.   It's a case by case instance, but in this
10   instance, no, I would say, go when you get there.
11       Q.   And get out of your car?
12       A.   Yes.
13       Q.   So you, as investigating this scene, didn't
14   find an issue with Officer Barrios getting out of his
15   car, as the first responder, by himself?
16       A.   No, sir.
17       Q.   Okay.  Now, let's go a little bit, if we could,
18   on your training as the investigating officer.  I guess,
19   was this -- did you investigate this as a homicide
20   detective or as a police shooting detective?  Explain
21   that to me.
22       A.   The same.
23       Q.   Okay.  At the time you were homicide detective?
24       A.   Yes.
25       Q.   What was your training?  Did you get any
```

```
 1   training to be a homicide detective?
 2        A.   Yes.
 3        Q.   Okay.  What was that training?
 4        A.   Multiple in-service schools, Miami-Dade
 5   Homicide School, Miami-Dade Advanced Homicide School,
 6   Medical Examiner's school for homicide investigators.
 7        Q.   Okay.
 8        A.   Forty hours each.
 9        Q.   Okay.  Was that two or three?
10        A.   Those are three right there.
11        Q.   Okay.  So that's 120 hours.
12        A.   Miami-Dade's use of force training.  Those are
13   two or three days.
14        Q.   And when you say, "Miami-Dade," we're talking
15   about the Miami-Dade Police Department?
16        A.   They sponsored it, but they have outside
17   instructors and sometimes their own.
18        Q.   And that was forty hours, as well?
19        A.   Yes.  Miami-Dade Community College Academy's
20   Death Investigation School.  Those are the ones that I
21   can remember.
22        Q.   Okay.  And how long were you doing homicide
23   investigations, prior to this incident?
24        A.   Almost two years.
25        Q.   Okay.  What is the first thing -- when you
```

```
 1   arrive on the scene, as a homicide investigator, what is

 2   the first thing that you're looking for?

 3        A.   Make sure the scene is secured.

 4        Q.   Okay.  And the next thing?

 5        A.   Get a brief synopsis from a supervisor on the

 6   scene.

 7        Q.   Synopsis of what?

 8        A.   What I've got, more or less.  Not in-depth,

 9   just, "What I'm looking at?"

10        Q.   Okay.  And just so we're clear, we're talking

11   about just a standard homicide, not this incident

12   specifically, just what is --

13        A.   Sure.

14        Q.   Okay.  Then, after you get a brief synopsis,

15   what then?

16        A.   We wait for the sergeant to arrive.

17        Q.   Okay.

18        A.   He gives us our instructions.

19        Q.   Okay.  In this case, you waited for your

20   sergeant, as well?

21        A.   Yes.

22        Q.   And when you're on a homicide that you're

23   investigating, I'm assuming you try to determine the

24   obvious, the victim, right?

25        A.   Yes.
```

1      Q.   Okay.  You try to hopefully find the

2  perpetrator?

3      A.   Yes.

4      Q.   At what point, if ever, do you try to determine

5  how exactly this happened, the homicide occurred?

6      A.   Through processing the crime scene and witness

7  interviews.

8      Q.   Okay.  Do you do the witness interviews prior

9  to processing the crime scene or after you process the

10  crime scene?

11      A.   In conjunction.

12      Q.   Okay.

13      A.   Every case is different.

14      Q.   Have you been trained -- or during your

15  training, have you been taught how not to be biased by

16  witness interviews?

17      A.   Yes.

18      Q.   Okay.  So that's something you take into

19  account?

20      A.   Yes.

21      Q.   The fact that you don't know who these

22  witnesses are and they might be biased?

23      A.   Correct.

24      Q.   Okay.  Let's go to this case, and we'll take it

25  pace-by-pace.  In this case, was there any witness that

```
 1   you could interview as to the actual shooting?
 2        A.   No.
 3        Q.   Well, you had one, but he didn't talk, which
 4   was Barrios?
 5        A.   Correct.
 6        Q.   There was nobody else that could tell you about
 7   the actual shooting?
 8        A.   No.
 9        Q.   So after you speak to the witnesses, what is it
10   that you do, that's part of your investigation of the
11   crime scene, to determine how exactly the homicide
12   occurred?
13        A.   The crime scene detective starts gathering all
14   pertinent evidence, but in this case, if she were -- or
15   in any case, if you're already done and the scene is
16   still secured, if something were to pop up that a
17   witness says, which makes you relook at the crime scene
18   and gather something else, then you do it.
19        Q.   Do you look at the crime scene?
20        A.   Yes, I get to walk -- as a lead, I walked it
21   through.
22        Q.   Okay.  And I'm talking just in general.
23        A.   Yeah.
24        Q.   You look at the crime scene.  If it's a
25   homicide where a firearm was involved, I'm assuming
```

```
 1   you're looking for bullet holes?
 2        A.   Yes.
 3        Q.   Either in the victims or in the surrounding
 4   crime scene?
 5        A.   Yes.
 6        Q.   And what is it that you look at the bullet
 7   holes for?  What are they going to tell you?
 8        A.   From which direction the shot came from,
 9   trajectory.
10        Q.   Okay.
11        A.   The distance.
12        Q.   In your training or in your experience, what
13   tools do you have at your disposal to determine, let's
14   say, start with, first, the distance that the firearm
15   was fired at?
16        A.   It's not really the tools.  I guess it would be
17   your eyes, to see if there's stippen or soot.
18        Q.   Okay.  What is stippen?
19        A.   It's like markings left -- burn marks left on
20   usually a body when a firearm is fired so close, that
21   the gas leaves burn marks on the body or clothing.
22        Q.   And that is different from what you said, soot?
23   Is that what you said?
24        A.   Soot can be found on a dirty firearm, just
25   uncleanliness, stuff coming out of the firearm that
```

```
 1   stays on the body or the clothing.

 2       Q.   And that would be something that you would use

 3   to determine it was fired very close to the victim?

 4       A.   Yes, and depending on how far apart the stippen

 5   is, the ME or the crime lab can make a determination --

 6   an approximation as to the distance.

 7       Q.   What if it's more than ten yards?

 8       A.   No.

 9       Q.   No, there won't be stippen or soot?

10       A.   No.

11       Q.   Would there be anything to help you determine?

12       A.   No.

13       Q.   So after a couple of yards, you can't tell how

14   far --

15       A.   At that point, you have to start looking at the

16   casings.

17       Q.   Okay.  Talk to me.  Why do you look at the

18   casings?

19       A.   Casings are ejected from a pistol and they can,

20   more or less, indicate where the shooter was standing.

21       Q.   Okay.  With casings, we're talking about

22   automatics, right, or semiautomatics, rather than the --

23   pistols, not revolvers, right?

24       A.   Yes.

25       Q.   Have you had any special training to determine
```

```
 1   how casings are ejected from different brands, types and
 2   caliber of pistols?
 3        A.   Basic training, and we're familiar with usually
 4   our own.
 5        Q.   Okay.  Are you familiar with or do you know --
 6   if you know, that certain firearms, different model
 7   firearms, the casings are ejected differently?
 8        A.   Yes, I'm aware.
 9        Q.   Okay.  And different calibers, the casings are
10   also ejected differently; is that correct?
11        A.   Yes.
12        Q.   Have you had training on which firearms and
13   which models eject the casings in which manners, is what
14   I'm saying?
15        A.   I haven't had training.  I'm more familiar with
16   the Glock pistol and what it does.
17        Q.   Okay.  Is that what was used in this incident
18   with Officer Barrios?
19        A.   Yes.
20        Q.   You carry the same firearm?
21        A.   Yes.
22        Q.   Okay.  And when you say you're familiar, it's a
23   personal experience?
24        A.   Yes.
25        Q.   What about trajectory, is that important?
```

```
 1        A.   In some cases, where it can be used.

 2        Q.   Okay.  What tools do you have at your disposal

 3   for determining trajectory of the bullets?

 4        A.   Dowel rods.

 5        Q.   That's like one of the main ones, right?

 6        A.   Yes.

 7        Q.   Have you ever used them?

 8        A.   Not personally.

 9        Q.   Who would use the dowel rods?

10        A.   If it could be used or if it was warranted, the

11   crime scene detective and/or the crime scene

12   technician --

13        Q.   Okay.

14        A.   -- would use it.

15        Q.   Okay.  Have you ever seen them used?

16        A.   Yes.

17        Q.   In your cases that you've investigated?

18        A.   No.

19        Q.   Okay.  Who, in this case, in the Barrios

20   shooting, the case that we're here for -- who would have

21   requested the dowel rods to be used?  Would that be you?

22        A.   The crime scene detective, myself, and/or the

23   sergeant could have, at any point, said, "Hey, why don't

24   we do this," if we thought it needed to be done.

25        Q.   Okay.  Typically, in your training and
```

```
 1   experience, when is it that you would want to use the

 2   dowel rods?

 3        A.   When I have an entry point and an exit point,

 4   like a vehicle or a wall or even a body.

 5        Q.   So you need an entry and an exit for you to use

 6   those?

 7        A.   The best case scenario.

 8        Q.   Why is that?  Explain that to me.

 9        A.   Because if they have a confirmed entry and exit

10   point, in a hard surface or on a non-moving surface,

11   then it's going to be more accurate.

12        Q.   Okay.  So in this case, why did you feel that

13   you, apparently, the sergeant, and the crime scene tech,

14   all feel that it wasn't warranted to use dowel rods?

15        A.   I only had an entry point -- two entry points

16   on the front windshield and the two projectiles were

17   inside the body.

18             MR. ANTONELLI:  Object to the form.

19   BY MR. MARTINEZ:

20        Q.   Okay.  Again, bear with me, why wouldn't you

21   want to use dowel rods, just because the projectiles

22   were in the body?

23        A.   The body has been removed.  It's not inside the

24   vehicle.  I'm not going to put a dowel rod through one

25   hole and I have no other point of reference to put it
```

 1    through.

 2         Q.   Okay.  So in this case, were you informed or

 3    were you able to determine where Anthony Arias was shot,

 4    where he was -- where his body physically was in the

 5    vehicle when he was shot?

 6         A.   All evidence indicated he was in the driver's

 7    seat.

 8         Q.   Okay.  So if you knew that, and, again, don't

 9    take this the wrong way, I'm just trying to

10    understand -- if you knew or you believed he was sitting

11    in the driver's seat, why couldn't you put a dowel rod

12    pointed towards the driver's seat?

13         A.   Again, without the point of reference, it would

14    have been someone taking a picture of something that

15    didn't need a picture.

16         Q.   Okay.

17         A.   There's two projectile strikes through the

18    front windshield and there's two projectiles inside the

19    body, that was -- by no other seat being available to

20    even be occupied, he was obviously in the driver's seat.

21         Q.   I understand that part.  I'm just trying to get

22    a handle on why not --

23         A.   I didn't think it would give me any other

24    answers.  I didn't think it was important.

25         Q.   Okay.  Well, you didn't think it would give you

```
 1   an answer on exactly where Officer Barrios was standing,
 2   in relation to the vehicle, when the shots were fired?
 3        A.   It wouldn't have given me his exact position.
 4   It would have given me a range.
 5        Q.   Okay.  And you don't think that range would
 6   have been important?
 7        A.   It think it would have been too wide to even
 8   summarize.
 9        Q.   Okay.  How many police shootings have you been
10   involved in, as a homicide detective, where an officer
11   fired his firearm, if you can remember?
12        A.   As a lead?
13        Q.   No, either or.  If it's too many, you can give
14   me a range, like over ten or over twenty or over a
15   hundred.
16        A.   I think it would be less than ten.
17        Q.   Less than ten?  More than five?
18        A.   I don't know.
19        Q.   Okay.  But less than ten?
20        A.   Less than ten.
21        Q.   More than three?  We know Barrios is one.
22        A.   At least four, less than ten.
23        Q.   Okay.  So four to nine?  That's about fair?
24        A.   Sure.  Okay.
25        Q.   In all of the police homicide shootings that
```

```
1    you were involved in, how many times was the officer

2    cleared for a good shooting?

3        A.   The three that I remember, that were Hialeah

4    cases, this one was cleared, the other two were cleared,

5    and the fourth one was another agency.  I don't know

6    what the outcome is.

7        Q.   Okay.  Do you remember the names of the other

8    two officers that were cleared?

9        A.   Francisco Hernandez, Orlando Baldo.

10       Q.   Baldo?

11       A.   Baldo, B-A-L-D-O.

12       Q.   Okay.  And I'm going to cut to the chase, on

13   those other two officers for the City of Hialeah that

14   were cleared, they happened before Barrios or after?

15       A.   Before.

16       Q.   In any of those cases, did the officers state

17   that they felt they needed to fire their firearm,

18   because they were going to be struck by a vehicle?

19       A.   I don't know what their statements were.

20       Q.   Do you remember if the facts involved a vehicle

21   coming towards them?

22       A.   Both.

23       Q.   Both of them?

24       A.   Yes.

25       Q.   Do you remember which one was the oldest
```

```
 1   incident, how far back we're going, prior to Barrios?
 2        A.   I think Francisco Hernandez was the first.
 3        Q.   Was that '07, '06, '02?  Do you remember, more
 4   or less?
 5        A.   Early '08.
 6        Q.   Okay.  And then Baldo was next?
 7        A.   Yes.  Oh --
 8        Q.   You wanted to add something?
 9        A.   At least five shootings.
10        Q.   Okay.  We're still between the four and the
11   nine range.  Do you remember the other -- was it another
12   officer at Hialeah?
13        A.   Yes.
14        Q.   Who was that?
15        A.   Leilani Diaz.  I don't know what her last name
16   was during the shooting.
17        Q.   And she was cleared?
18        A.   Yes.
19        Q.   And did that involve a vehicle?
20        A.   Yes.
21        Q.   Were you present at the scene -- let me jump
22   around a little bit here.  Maybe I'll come back to the
23   policies, but I think I'm done, but if something comes
24   up.  Were you at the scene on this case, the Barrios
25   shooting, when ASA -- Assistant State Attorney Gail
```

```
 1   Levine showed up at the scene?
 2        A.   Yes.
 3        Q.   Did you speak to her?
 4        A.   Yes.
 5        Q.   Did you give her a brief synopsis of what had
 6   occurred?
 7        A.   Yeah.  Yes, I'm the one that called her and she
 8   met with me, yes.
 9        Q.   Okay.  When you say, "Brief synopsis," what did
10   you tell her?
11        A.   I don't remember verbatim, but I ran through
12   the facts that we had at that time, that they were
13   dispatched to a burglary in progress.  Barrios arrived.
14   The vehicles are where they are.  It was probably an
15   apparent vehicle assault.
16        Q.   Okay.  Let's stop right there.  Where did you
17   get the information that it was an apparent vehicle
18   assault?
19        A.   Based on what we had on the scene and what we
20   were Looking at.  I said, "Apparent."  I never told her
21   for sure.
22        Q.   Okay.  I understand.
23             But in order for you to think that there was an
24   apparent assault with a vehicle, did anybody tell you
25   anything at that time or were you just looking at the
```

```
 1   physical evidence --
 2        A.   We had our initial statements from the
 3   witnesses.  I don't know if they were already put on
 4   tape or if they gave their official statements, but we
 5   knew, more or less, what they were saying.
 6        Q.   So we're sure, we're talking about garbage --
 7        A.   Yes.
 8        Q.   The sanitation workers?
 9        A.   Yes.
10        Q.   But they didn't see the actual shooting?
11        A.   No.
12        Q.   They didn't see the vehicle allegedly coming
13   towards Barrios?
14        A.   No.
15        Q.   Did anybody else talk to you about the scene,
16   other than those guys?
17        A.   The sanitation workers?
18        Q.   Yeah, other than the sanitation workers.
19        A.   No.
20        Q.   Have you had any other --
21        A.   No.
22        Q.   Had you received the proffer yet from Barrios'
23   attorney?
24        A.   Can I look at my notes?
25        Q.   Absolutely, please.
```

```
 1        A.   I don't have the time she arrived on the scene,
 2   but it's going to be very -- very close proximity.
 3        Q.   What does that mean?  I'm sorry, what does that
 4   mean?
 5        A.   I received the proffer at 6:35 a.m. and --
 6        Q.   Gail arrived after that?
 7        A.   Probably a little bit after, because she
 8   arrived at sunrise.
 9        Q.   Okay.  Did ASA Levine view the scene herself?
10   Do you remember?
11        A.   We guided her through the scene.
12        Q.   Okay.  And as you were guiding her through,
13   were you talking to her about what you believed
14   occurred?
15        A.   Other than the first mention of, it's probably
16   an apparent vehicle assault, with shots fired, I didn't
17   go into any hypotheticals or any other theories.
18        Q.   Was she asking you any questions about the
19   incident itself in more detail?
20        A.   "What's this?  What's that?  There's a casing
21   over there.  There's blood over there."  She asked me if
22   it was Officer Barrios' -- if he had any other police
23   shooting.
24        Q.   She asked you if Officer Barrios had other
25   police shootings?
```

```
 1        A.   Yes.
 2        Q.   Have you ever fired your firearm in the line of
 3   duty?
 4        A.   No.
 5        Q.   Going back to Ms. Levine, do you know if
 6   anybody else spoke to her on the scene that day, any
 7   other officer or sergeant, supervisor, major, LT,
 8   anybody?
 9        A.   Just cordial stuff, nothing --
10        Q.   Yeah, nothing -- nothing about the case?
11        A.   No.
12        Q.   Yeah, I don't --
13        A.   I think the Internal Affairs gave her his
14   business card, to let her know that he was going to be
15   the IA.
16             MR. MARTINEZ:  Off the record.
17             (Discussion off the record.)
18             MR. MARTINEZ:  Back on the record.
19   BY MR. MARTINEZ:
20        Q.   The video that you saw, where was that video
21   from?  Do you remember?
22        A.   The one that we've been questioning --
23        Q.   Yes.
24        A.   City Hall.
25        Q.   The City Hall video?
```

```
 1              Did you keep a copy of that?  Did you see that?
 2    Do you have a copy of that?
 3         A.   Yes.
 4         Q.   And that showed nothing to help you with the
 5    actual incident, did it?
 6         A.   No.
 7         Q.   Okay.  Did you actively try to seek out other
 8    video in the area that might have shown the incident?
 9         A.   Multiple times.
10         Q.   Okay.  And when you say that -- by the way, for
11    the record, you're nodding your head and raising your
12    eyebrows, like you really tried to look for those?
13         A.   We did our routine one, and then based on
14    family calls or -- I'm not saying family, because I
15    can't say who it was --
16         Q.   Persons?
17         A.   I think the State Attorney kept on getting
18    calls.
19         Q.   People close to Anthony Arias?
20         A.   I don't know specifically.  "Oh, there's a
21    video here and it showed everything."  So we had to drop
22    everything that we were doing and come out and look and
23    see and either the videos weren't working or --
24         Q.   Okay.  Let's go through it, so we can have that
25    flushed out.  You went to, I guess, locations that
```

1  allegedly had videos?

2      A.   Yes.

3      Q.   And you spoke to the people that worked there

4  or lived there or owned it?

5      A.   Yes.

6      Q.   And inquired about the videos?

7      A.   Yes.

8      Q.   And you were told, what?

9      A.   Most, that they weren't operational.

10      Q.   Okay.  So you never saw nor know of any video

11  that would have shown what happened that day?

12      A.   No, nothing.

13      Q.   You spoke earlier -- you said you recognized

14  Officer Barrios' voice on the radio -- when he made the

15  radio transmission?

16      A.   Gonzalez.

17      Q.   Oh, Gonzalez?  But I thought you said you

18  recognized Officer Barrios', as well, no?

19      A.   I think we were referring to Gonzalez, that

20  after -- I had said that it was Acosta's voice, but he

21  worked for me for like a year, you get to hear his

22  voice, and you know it was him.

23      Q.   Yeah, you did say about Gonzalez.

24          So let me ask you, would you -- when you were

25  listening to these tapes the first time, the radio

```
 1  transmissions, did you recognize Officer Barrios' voice?

 2       A.   Usually, because he referred to 2310, because

 3  he was saying his call sign.  I don't independently know

 4  his voice like that.

 5       Q.   Okay.  That's what I was getting at.  So you

 6  don't know his voice like that?

 7            Have you ever trained Officer Barrios?  Did he

 8  ever work under you, while you were in the Department?

 9       A.   I wasn't a supervisor yet, and when he started

10  here, I was on patrol -- I was still a patrol officer on

11  midnights.  Very few -- few -- less than five or ten

12  rides with him.

13       Q.   So it would be safe to say that you didn't hang

14  out with him?

15       A.   No.

16       Q.   You didn't train him?

17       A.   No.

18       Q.   You weren't partners with him?

19       A.   No.

20       Q.   There was no conflict for you in investigating

21  Officer Barrios?

22       A.   No.

23       Q.   Okay.  Had there been a conflict, is there a

24  policy for investigating these police shootings, when

25  the officer that goes out to investigate it knows them?
```

```
1    Is there a policy in place?

2         A.   I don't recall a specific policy, unless it's

3    some broad ethics policy.

4         Q.   Okay.  Okay.  Let's refer to Exhibit 14, if we

5    could.  That's the overhead or the aerial view of the

6    scene, if I'm not mistaken.  If you don't mind me

7    sitting a little bit closer to you, so we can see.

8              As you're looking at this scene -- the first

9    question -- I'm going to go, actually, backwards, okay?

10   The first question is, Officer Barrios' vehicle is in

11   the entry way, correct?

12        A.   Yes.

13        Q.   What they call the ingress or egress, entrance

14   and exit, of the parking lot, correct?

15        A.   Yes.

16        Q.   Just by your visual estimation, is there enough

17   room for the SUV, which in this picture is resting up

18   against the curb -- is there enough for the SUV to have

19   left that area?

20        A.   Yes.

21        Q.   Okay.  In looking at this scene, in order for

22   the SUV to be in that position, if we're to believe the

23   garbage men witnesses, I think you testified to this

24   earlier -- if we're to believe the garbage men

25   witnesses, the SUV would have had to back up first, and
```

```
 1  then make a right turn, to be in the position it's in,
 2  correct?
 3      A.  Yes.
 4      Q.  Okay.  Now, in looking at this scene, how did
 5  you determine -- because this is the scene you saw when
 6  you got to the scene of the incident, correct?
 7      A.  Yes.
 8      Q.  How did you determine where exactly the SUV was
 9  when the shots were fired?
10      A.  I had a casing on the ground --
11      Q.  Okay.
12      A.  -- which based on the projectile strikes, where
13  Mr. Arias was sitting, where the casing was on the
14  ground, it would have placed Officer Barrios in a
15  position where the SUV is now.
16      Q.  Okay.
17      A.  So did that answer the question?
18      Q.  I'm asking you.  I'm trying to figure out,
19  first, how you came to your determination, and then I'll
20  ask you some questions.
21      A.  So based on that, and on the other casing on
22  the windshield, you know, it's obvious he was towards
23  the front right hood, quarter panel area, of the SUV, as
24  the SUV was further back than the position it is in now.
25      Q.  Okay.  That's what I was going to ask you.  So
```

```
 1  based on what you told me earlier -- let's go step by

 2  step.  You really have no way to determine just how far

 3  Officer Barrios was from the SUV, because there's no

 4  soot or stippen on the windshield, correct?

 5          MR. ANTONELLI:  Object to the form.

 6          THE WITNESS:  Correct.

 7  BY MR. MARTINEZ:

 8      Q.  So that's one of the things you tried to

 9  determine, whether he was right up against the

10  windshield or not?

11      A.  Correct.

12      Q.  All right.  And since you saw no soot or

13  stippen, you figured he couldn't have been up against

14  the windshield?

15          Okay.  Next thing you looked at were the shell

16  casings?

17          MR. KRUEGER:  Is that a yes or a no?

18          THE WITNESS:  The firearm couldn't have

19      been pressed up against the windshield.

20           MR. MARTINEZ:  Oh, yes, Alan, I'm sorry.

21      Thank you.

22  BY MR. MARTINEZ:

23      Q.  You didn't answer my question.

24      A.  No, the firearm couldn't have been pressed up

25  against the windshield.
```

```
 1        Q.   The next thing you would have looked at are the

 2   shell casings, correct?

 3        A.   Yes.

 4        Q.   The shell casings would have told you where

 5   Officer Barrios was standing?

 6             MR. ANTONELLI:  Object to the form.

 7             THE WITNESS:  To a certain degree of

 8        certainty.  It's not a -- it's an estimate.  A

 9        lot of things can happen to casings on a scene.

10        They can get kicked or they can move.

11   BY MR. MARTINEZ:

12        Q.   They can roll?

13             Especially when a city-wide officers to the

14   scene gets called out there, right?

15             MR. ANTONELLI:  Object to the form.

16             MR. KRUEGER:  Form objection.

17   BY MR. MARTINEZ:

18        Q.   Next, but you don't know exactly how far the

19   SUV was from Officer Barrios, do you?

20        A.   No, I do not.

21        Q.   Okay.  Now, in looking at this photo, I want to

22   clarify something, so answer my question on this, if you

23   could, we see Officer Barrios' car in this photo,

24   Exhibit 14, with his driver's side door open, correct?

25        A.   Yes.
```

```
 1        Q.   We see the SUV, with the driver's side door

 2   open, correct?

 3        A.   Yes.

 4        Q.   You just told me that it's your belief that

 5   Officer Barrios was standing over by the curb of the

 6   parking lot, which has shrubbery, right?

 7        A.   Somewhere in that general area, between his

 8   car -- we're talking about when the actual shot was

 9   fired?

10        Q.   Yes, please.

11        A.   I believe it's somewhere between -- the half

12   point between the left front of the vehicle --

13        Q.   Which vehicle?

14        A.   His vehicle.

15        Q.   Okay.

16        A.   -- and the curb, somewhat from halfway further

17   south.

18        Q.   Now, from that curb to where the SUV was

19   parked -- and let me strike that.  Let me clarify.

20             If we're to believe the garbage man, the SUV

21   was parked parallel to the strip mall sidewalk, correct?

22        A.   Yes.

23        Q.   And this direction that the SUV was facing,

24   would have been --

25        A.   North.
```

```
 1        Q.   North?
 2             So the SUV would have had to back up south?
 3        A.   Yes.
 4        Q.   Approximately how many feet do you think the
 5   SUV backed up south, before it started turning to go to
 6   the right?
 7        A.   Twenty-five feet, more or less.
 8        Q.   And then it would have made a right-hand turn
 9   to start turning towards the exit, where you believe
10   Officer Barrios was standing?
11        A.   Yes.
12        Q.   Okay.  Now, from where the left front quarter
13   panel of Officer Barrios' car is, he's right close to
14   the sidewalk, correct, that part of the car, and
15   actually his door is open on the sidewalk area, correct?
16        A.   Yes.
17             MR. ANTONELLI:  Object to the form.
18             MR. KRUEGER:   Objection to form.
19   BY MR. MARTINEZ:
20        Q.   How far is it from the left front quarter panel
21   of Officer Barrios' car or his door, which is wide open,
22   to the curb area that the car is resting up against?
23             MR. ANTONELLI:  Object to the form.
24             THE WITNESS:  Probably twelve feet, about.
25   BY MR. MARTINEZ:
```

1       Q.   And in this scene, so we're clear, there are

2    six parking spaces in the parking area, correct?

3       A.   Yes.

4       Q.   And there are no other vehicles in the parking

5    area?

6       A.   Correct.

7       Q.   Did you ever consider that it was possible that

8    Officer Barrios could have moved out of the way of that

9    vehicle?

10          MR. DESAI:   Form.

11          THE WITNESS:   He could have.   Depends on

12       the speed that the subject vehicle was coming

13       at him.   Maybe he didn't have enough time.

14   BY MR. MARTINEZ:

15      Q.   Okay.   What did you determine, if anything,

16   about the fact that the bullet holes that were in the

17   windshield, and I'm going to try to find a nice exhibit

18   for you -- do you remember which exhibit it was that had

19   the windshield with the bullet holes?

20          MR. KRUEGER:   It's near the end.

21   BY MR. MARTINEZ:

22      Q.   Yes, 24.   Exhibit 24.

23          Okay.   We are looking at a closeup of the

24   windshield on Exhibit 24; is that correct?

25      A.   Yes.

```
 1          Q.   About how far, in inches, are those bullet
 2   holes from what they call the A-pillar of the vehicle --
 3   the A-pillar on the passenger side or the right side of
 4   the vehicle?
 5          A.   I don't know.
 6          Q.   Well, this shows you the inches from here to
 7   there.  If you remember, if you can look at the photo
 8   and estimate --
 9          A.   I'd say, less than a foot.
10          Q.   Okay.  Now, you stated in your report that you
11   felt Officer Barrios was in the tunnel of the travel of
12   the vehicle -- of the SUV, correct?
13          A.   Yes.
14          Q.   Give me a second.  We can use this one, if you
15   remember, or we can use any other one you'd like here.
16   There's a photo here and this is in the windshield in
17   the front.
18               Those bullet holes are actually directly in
19   front of the passenger seat of the SUV, are they not?
20          A.   Yes.
21          Q.   So here's my question, and going back to
22   Exhibit 14, if Officer Barrios would have been in
23   that -- how did you describe it, the tunnel?
24          A.   The tunnel of the vehicle.
25          Q.   For lack of a better term, as we look at
```

```
 1    Exhibit 14, that tunnel is actually now on the left side
 2    of the SUV?
 3         A.   Yes.
 4         Q.   Whereas the bullet holes are actually on the
 5    right side of the SUV?
 6         A.   Yes.
 7         Q.   Okay.  So here's where I'm a little confused.
 8    How could he have been standing in this tunnel, yet the
 9    bullets -- the tunnel is on the left side of the SUV,
10    yet the bullets go in through the right side of the SUV?
11              MR. ANTONELLI:  Object to the form.
12              MR. KRUEGER:  Joint.
13              THE WITNESS:  It's important to note that
14         the vehicle's tires are -- if you look at it as
15         if -- where the final resting place of the
16         Tahoe is, you can't look at it like that.
17    BY MR. MARTINEZ:
18         Q.   Okay.
19         A.   You have to assume this vehicle is further
20    back.
21         Q.   Okay.  So it's clear for the record, when you
22    say, "Further back," further back closer to the strip
23    mall sidewalk?
24         A.   It's doing a hard right turn, as evidenced by
25    the right angle of the tires, which remains that way.
```

```
 1   If you push that vehicle back, let's say, another car
 2   length --
 3        Q.   Okay.
 4        A.   -- you can have Officer Barrios in the same
 5   tunnel, with a car coming at him, which he has no duty
 6   to retreat, and he flees towards his left, as he's
 7   firing at this 2,000 pound car coming at him,
 8   conceivably you can justify or you could see how you get
 9   that angle through the window.
10        Q.   Okay.  Conceivably, but is -- and, again, you
11   were limited, because you didn't have anybody to tell
12   you what they actually saw.  I understand that.
13        A.   Correct.
14        Q.   But isn't it also possible that he could have
15   been over to the right side of the SUV when he fired?
16        A.   It could be, and depending on how hard the car
17   was turning, how fast, he could still be in danger,
18   because the car is not going straight forward.  So he
19   just would have gotten hit by -- instead of the front of
20   the car, right there by the front right quarter panel.
21        Q.   But by looking at the entry holes of that
22   windshield, the bullets, when they went through the
23   windshield, and knowing that according to the proffer
24   and what you believe from what you saw at the scene,
25   that someone was sitting in the driver's side, wouldn't
```

```
1    you say that the bullets, when they actually went
2    through the windshield, that Officer Barrios was not
3    directly in front of the vehicle?
4              MR. ANTONELLI:  Object to form.
5              MR. KRUEGER:  Form.
6              THE WITNESS:  Yes.
7    BY MR. MARTINEZ:
8         Q.   He was not?
9         A.   No.
10        Q.   Okay.  Now that I wrote down your policy for
11   today, for now, I just want to make sure if it was the
12   policy back then or now.  Where did I write that down?
13             The policy today, you know as being that you
14   try to avoid being struck by a vehicle before you fire?
15        A.   Correct.
16        Q.   You don't remember what the policy was back
17   then?
18        A.   I think the actual wording is, you know, don't
19   place yourself in harm's way.
20        Q.   Okay.  And you don't know what the policy was
21   back then?
22        A.   I don't know if this was in effect.
23        Q.   Okay.  Would you say that if Officer Barrios
24   was standing in the tunnel area, that you're claiming is
25   a tunnel area, and I don't mean that in a bad way?
```

```
 1        A.   No, it's my term.

 2        Q.   That he would have been standing in the only

 3   possible exit way for a fleeing felon, otherwise the SUV

 4   would have to strike his car or strike the poles in

 5   the --

 6        A.   Or stop and surrender.

 7        Q.   Correct, or stop and surrender.

 8             But if somebody was trying to flee in a

 9   vehicle, by standing in the way, he would have put

10   himself right in the way of the vehicle?

11             MR. ANTONELLI:  Object to the form.

12             THE WITNESS:  No, I don't agree with that

13        at all.

14   BY MR. MARTINEZ:

15        Q.   Okay.  What do you agree with?

16        A.   That's where his duty is to stand.  Get out of

17   your car, sit here at a safe distance, before your

18   backup arrives, give a subject who's fleeing lawful

19   orders, and now he's coming at you.

20        Q.   Okay.

21        A.    If Officer Barrios would have gone right -- as

22   the vehicle was still parked, where the sanitation

23   workers saw it, got right in front of the car, saw him

24   enter the car the entire time, and he knows the guy is

25   going to go this way, that's a whole different story.
```

```
 1        Q.   When you say, "This way," it's --
 2        A.   North, through -- over a parking curb, over a
 3   bush.
 4        Q.   Why would that be a different story, if he
 5   stood in front of the vehicle that was parked in a
 6   parking space?
 7        A.   This guy would have already been in his car.
 8   He's running all the way over here to get himself in
 9   front of the car.  That's a different story.
10        Q.   Okay.  I see what you're saying.  You're saying
11   Barrios, it would have been different, because he would
12   have run over to where the car was?
13        A.   Yeah.  I mean, we're speculating.  The point
14   being, that's where Officer Barrios had a right to be,
15   as he's confronting a fleeing felon.
16        Q.   Okay.  And I understand what you're trying to
17   tell me.  What I'm trying to get a grasp on is, did he
18   shoot Anthony Arias because he was a fleeing felon?
19             MR. ANTONELLI:  Object to the form.
20             MR. DESAI:  Joint.
21             MR. KRUEGER:  Object to the form.
22             THE WITNESS:  According to the proffer,
23        because he was in fear for his life, because of
24        the 2,000 pound car coming at him.
25   BY MR. MARTINEZ:
```

```
 1        Q.   And that's why I'm asking, do you think that he
 2   (A) could have gotten out of the way of that car,
 3   because the car was so far away --
 4        A.   He may very well have been trying, as he's
 5   running for his life to the left, shooting with his
 6   right hand, as he's stumbling trying to get out of way.
 7        Q.   Okay.  So the record is clear, when you say,
 8   "Running to the left," you mean, running towards the
 9   curb, running south, which might have explained the
10   angle of the bullet holes?
11        A.   Yes.  You pointed towards the sidewalk.  I
12   don't think he was on this side.  I think he was on the
13   west side of the -- between the center, like I explained
14   before --
15        Q.   Between the center exit --
16        A.   Between the center and then towards the
17   southwesterly direction.
18        Q.   Which would put him inside the parking lot, in
19   one of the parking spaces?
20        A.   Yes.  Not towards the sidewalk.  Somewhere in
21   that area.
22        Q.   It would have put him inside one of the parking
23   spaces?
24        A.   Maybe not that far.
25             MR. ANTONELLI:  Object to the form.
```

```
 1              MR. DESAI:  Form.

 2              MR. KRUEGER:  Objection to form.

 3              THE WITNESS:  Maybe not that far.

 4   BY MR. MARTINEZ:

 5      Q.  You know, I'm not trying to Monday morning

 6   quarterback.  I'm just trying to get a full

 7   understanding of how --

 8      A.  No, I know. It's okay.  I got you.

 9              MR. KRUEGER:  Objection to the explanation

10         of not trying to Monday morning quarterback.  I

11         think that's exactly what you're doing.

12              MR. MARTINEZ:  Objection to Alan giving me

13         his opinion.  When I want his opinion, I'll ask

14         for it.

15              MR. ANTONELLI:  Object to the form.  No

16         question was pending.

17   BY MR. MARTINEZ:

18      Q.  So let me ask you something, as far as what you

19   understand the policy, so I make sure what you believe

20   is in the policy and how you've been trained, so you're

21   saying -- is it your understanding that Officer -- even

22   under today's policy, where is to avoid putting yourself

23   in harm's way, had Officer Barrios been standing in the

24   exit way of that parking lot, that is not considered

25   putting himself in harm's way?
```

```
 1         A.    That's not my believe.
 2         Q.    Okay.  Were you -- is it because of what you
 3    read and you've made up your own decision or did
 4    somebody train you or tell you, "Listen, that wouldn't
 5    be harm's way"?
 6         A.    Everything, what I've read, experience,
 7    everything.
 8         Q.    But as far as your supervisor or anybody in
 9    your Department explaining the policy, did they explain
10    it to you that way?
11              MR. KRUEGER:  Objection to the form.
12              THE WITNESS:  We didn't get into the
13         specific scenario.
14    BY MR. MARTINEZ:
15         Q.    Okay.  On Exhibit 32-B, there's a puddle of
16    blood over the curb, which is actually on the right-hand
17    side of Officer Barrios' vehicle, right?
18         A.    Yes.
19         Q.    Is there also a puddle of blood right next to
20    his vehicle or is that something else?  Do you remember?
21         A.    I think that's probably -- depending on when
22    the photograph was taken, that could be water coming
23    from his vehicle.
24         Q.    Okay.
25         A.    It could be some liquid from fire rescue
```

```
 1   disposed or something there.
 2       Q.   Okay.  You're not sure?
 3       A.   It's not blood, because we didn't document any
 4   blood there.
 5       Q.   Okay.  That's what I wanted to know.
 6            Going back to Exhibit -- forget about the
 7   exhibit.  I'll just ask you the one last question.  When
 8   you did this investigation, is it fair to say you were
 9   somewhat limited, because you had no actual eyewitness
10   to what happened that day on the scene?
11       A.   Yes.
12       Q.   Okay.  And although I know you truly believe
13   that the incident occurred the way you said it occurred,
14   is it possible that it could have occurred the way I was
15   describing it, as well?
16            MR. ANTONELLI:  Objection to form.
17            MR. DESAI:  Form.
18            MR. KRUEGER:  Form.
19            THE WITNESS:  Can you repeat it?
20   BY MR. MARTINEZ:
21       Q.   Where Officer Barrios was, in fact, not
22   directly in front of the SUV when he fired those shots
23   and he could have gotten out of harm's way?
24            MR. DESAI:  Form.
25            MR. ANTONELLI:  Object to the form.
```

```
 1            THE WITNESS:  I don't believe he could have
 2       gotten out.  I don't think he had a duty to,
 3       either.
 4  BY MR. MARTINEZ:
 5       Q.  I know you don't, but because you were limited
 6  in your information.
 7       A.  Can you repeat the question, whole, just one
 8  time?
 9       Q.  We'll take it one at a time.  The bullet holes
10  in the windshield are clearly in front of the passenger
11  side of the SUV, correct?
12       A.  Yes.
13       Q.  And if we are to believe that Anthony Arias was
14  sitting in the driver's seat, those bullet holes would
15  have had to come, and you did state that, when Officer
16  Barrios was actually off to the side of the right front
17  quarter panel or the passenger side front quarter panel?
18       A.  Correct.
19       Q.  He would not have been standing in front of the
20  SUV?
21       A.  Correct.
22       Q.  So I know what you're stating, but what I'm
23  saying is, because of that, he wasn't in front of the
24  SUV?
25            MR. ANTONELLI:  Object to the form.
```

```
 1              THE WITNESS:  When he actually fired the
 2         shot, no.
 3  BY MR. MARTINEZ:
 4      Q.   So he wasn't in harm's way when he fired the
 5  shot?
 6              MR. DESAI:  Form.
 7              MR. ANTONELLI:  Object to the form.
 8              THE WITNESS:  I can't agree with that
 9         statement.
10  BY MR. MARTINEZ:
11      Q.   Okay.  Is it possible?
12              MR. ANTONELLI:  Object to the form.
13              MR. DESAI:  Form.
14  BY MR. MARTINEZ:
15      Q.   They just like to object.
16      A.   Is it possible --
17              MR. ANTONELLI:  Excuse me.  It's not that I
18         like to do that.  It's an inappropriate
19         comment, for the record.
20              MR. MARTINEZ:  Well, I asked him what I
21         believe -- I can ask him what his opinion is.
22         I can ask him about his determination.
23              MR. ANTONELLI:  You have an absolute right
24         to ask him whatever question you would like,
25         sir.
```

```
 1              MR. MARTINEZ:  Okay.

 2              MR. ANTONELLI:  You don't have a right to

 3       characterize my objection.

 4              MR. MARTINEZ:  I apologize.  I didn't mean

 5       to offend you.

 6              MR. ANTONELLI:  You did not offend me.  It

 7       was an inappropriate comment by you as a

 8       licensed lawyer, but you can ask him whatever

 9       you want, and do so.

10              MR. MARTINEZ:  Okay.  You've had your say.

11  BY MR. MARTINEZ:

12       Q.  Well, the question was, you don't think it's

13  possible that he wasn't in harm's way and that he was

14  not standing in front of the vehicle?

15              MR. DESAI:  Form.

16              THE WITNESS:  Repeat it.

17  BY MR. MARTINEZ:

18       Q.  So we can go back to where we're at, you agree

19  that when the shots were fired Officer Barrios was not

20  actually standing in front of the vehicle?

21       A.  Correct.  When the actual shot was fired, he

22  was not in front of the vehicle.

23       Q.  Correct.  That's why I'm having a difficult

24  time with that.  So my question to you is not whether

25  you agree with me, but is it possible that Officer
```

```
 1   Barrios was not in harm's way when the shots were fired?
 2          MR. DESAI:  Form.
 3          MR. ANTONELLI:  Object to the form.
 4          THE WITNESS:  It could be possible.
 5          MR. KRUEGER:  Before you go on, let me just
 6      -- could I take it out of turn?
 7          MR. MARTINEZ:  Sure.
 8          MR. KRUEGER:  Because you just asked that
 9      question.
10          If somebody is standing in the middle of
11      the vehicle, they're in front of the vehicle,
12      correct?
13          THE WITNESS:  Yes.
14          MR. KRUEGER:  They can also be standing in
15      front of vehicle, on the passenger side of the
16      vehicle; is that correct?
17          THE WITNESS:  Yes.
18          MR. KRUEGER:  And they can also be standing
19      in front of the vehicle, on the driver's side
20      of the vehicle, correct?
21          THE WITNESS:  Yes.
22          MR. KRUEGER:  Now, with respect to the
23      question that he was asking, are you saying
24      that the person was not standing or conceivably
25      was not standing in front of the vehicle or
```

```
1          that he wasn't standing in the middle of the

2          vehicle?

3               THE WITNESS:  I believe he was standing in

4          front of the vehicle, whether it's center, left

5          or right, when the threat came at him.

6               MR. KRUEGER:  Okay.

7               THE WITNESS:  I believe that when he jumped

8          out of the way, ran out of the way, walked out

9          of the way, period, he got out of the way of a

10         fleeing 2,000 pound car coming at him, when the

11         shot actually went off, he was just on the

12         passenger side, not in front of the vehicle,

13         when the actual shot fired.

14              MR. KRUEGER:  Okay.

15              MR. MARTINEZ:  No further questions.

16                        CROSS EXAMINATION

17   BY MR. ANTONELLI:

18      Q.   Counsel asked you whether or not there were any

19   eyewitnesses to the shooting?

20      A.   Yes.

21      Q.   To be fair, there would have been two people

22   that would have had direct knowledge of what happened at

23   the very time of the discharge of the weapon, fair?

24      A.   Yes.

25      Q.   Mr. Arias, as well as Officer Barrios, correct?
```

```
1        A.   Yes.
2        Q.   Next, when you were considering the questions
3   asked by counsel for the Arias family, as you are at
4   this scene doing your investigation, you are taking into
5   consideration the fact that one of the pieces of
6   evidence at this scene was this green motor vehicle that
7   was moving?
8        A.   Yes.
9        Q.   So within your analysis of where people were
10  standing in and relationship to whether they were in
11  front of, you weren't dealing with a static condition,
12  you're dealing with a fluid, moving set of facts?
13       A.   Yes, sir.
14            MR. ANTONELLI:  That's all I have.  Thank
15       you.
16            MR. MARTINEZ:  You don't want to ask
17       anything?
18            MR. DESAI:  Give me one second.
19            We're all right.  Thanks.
20            (Thereupon, the reading and signing not being
21   duly waived, the deposition was concluded at 3:30 p.m.)
22
23
24
25
```

```
 1
 2
 3
 4
 5                                    _____
                                              DEPONENT
 6
 7         Sworn to and subscribed before me this _____
 8  day of _____, 2012.
 9
10
11
12                     _____
                              NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA    :
                         SS
 3   COUNTY OF MIAMI-DADE:

 4            I, NIEVES SANCHEZ, Court Reporter, and a
     Notary Public for the State of Florida at Large, do
 5   hereby certify that SERGEANT JOSE PROVEYER personally
     appeared before me and was duly sworn.
 6            WITNESS my hand and official seal in the
     City of Miami, County of Miami-Dade, State of Florida,
 7   this 29th day of June, 2012.

 8
                         _____
 9                       NIEVES SANCHEZ

10   Notary Commission Number EE 116849
     My Notary Commission expires August 1, 2015
11   Bonded Through Atlantic Bonding Company, Inc.

12            REPORTER'S DEPOSITION CERTIFICATE

13
     STATE OF FLORIDA    :
14                       SS
     COUNTY OF MIAMI-DADE:
15
              I, NIEVES SANCHEZ, Court Reporter and a Notary
16   Public for the State of Florida at Large, do hereby
     certify that I was authorized to and did report the
17   deposition of SERGEANT JOSE PROVEYER; that a review of
     the transcript was requested; and that the transcript is
18   a true and complete record of my stenographic notes.
              I further certify that I am not a relative,
19   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
20   attorney or counsel, nor am I financially interested in
     the action.
21
              DATED this 29th day of June, 2012.
22

23
                         _____
24                       NIEVES SANCHEZ

25
```

**Bailey & Sanchez Court Reporting, Inc.**
*28 W. Flagler Street, Suite 555, Miami, Florida 33130*
**(305) 358-2829**

```
 1              BAILEY & SANCHEZ COURT REPORTING, INC.
                  28 West Flagler Street, Suite 555
 2                     Miami, Florida  33130
                         (305) 358-2829
 3

 4                          June 29, 2012

 5
         Sergeant Jose Proveyer
 6       C/O:  Alan E. Krueger, Assistant City Attorney
         William M. Grodnick, City Attorney
 7       501 Palm Avenue
         Fourth Floor
 8       Hialeah, Florida 33014

 9       RE:  Consuelo Alfonso vs. City of Hialeah, et al.

10       Dear Sergeant Proveyer:

11       The transcript of your deposition, taken in the
         above-styled cause on June 19, 2012, is at my office
12       awaiting your examination and signature.  PLEASE
         TELEPHONE BEFORE COMING IN so that we may arrange a
13       convenient time.

14       Please be advised that unless I hear from you by July
         29, 2012, I will forward the original of your deposition
15       to the deposing attorney, as though you had read and
         signed your deposition.
16
         IN THE EVENT a copy of the transcript is being sent to
17       the witness by counsel, kindly instruct the witness to
         make any changes thereto on a separate sheet of paper
18       and refer to the page number and line number which
         corresponds to the change desired.  DO NOT MAKE THE
19       CORRECTIONS ON THE TRANSCRIPT.  If you have any
         questions, please call.
20

21       Very truly yours,

22

         NIEVES SANCHEZ
23       Court Reporter

24

         cc:  Mark R. Antonelli, Esq.
25            Edward A. Martinez, Esq.
```

**Bailey & Sanchez Court Reporting, Inc.**